The decree is affirmed, and the appeal dismissed at the costs of the appellants.

# Appeal of Whelen et al.
# Appeal of The City of Pittsburgh.

1. An Act of Assembly which authorizes the issue of municipal bonds, which "shall be sold at not less than par," and provides that "the councils may allow a reasonable compensation for the sale or negotiation of the said bonds," does not warrant the allowance of a commission to a purchaser of the bonds from the city at par. Such an arrangement is virtually a sale at less than par. The intendment of the Act is that compensation may be paid to an agent of the municipality for his services in effecting a sale of such bonds at or above par, but not to one who purchases the bonds direct from the city.

2. The Act of May 9th, 1879 (P. L. 49), authorized the councils of cities of the second class by ordinance to authorize the making and negotiation of certain bonds, and provided inter alia: Said bonds "shall be sold at not less than par, with accrued interest, but the councils may allow a reasonable compensation for the sale or negotiation of the said bonds." Councils of the city of Pittsburgh, in pursuance of said Act, authorized by ordinance the issuing of such bonds, under the management of a sub-committee, which was authorized to fix the rate of commission to be allowed, &c. This committee entered into a contract with two persons which contained the following: "The city of Pittsburgh sells at par and accrued interest to " A. and B. bonds so authorized; A. and B. "shall be allowed a commission of one per centum upon all bonds purchased or exchanged by them under the provisions of this agreement." After the contract had been partly executed and a large amount of bonds had been issued to A. and B. on payment of par, and had been resold by them, upon a bill in equity filed by citizens and tax-payers against the city and said A. and B.,

   *Held* (1.) That said contract was not authorized by said Act, and it was therefore annulled and its further execution enjoined.

   (2.) That the rights of bona fide purchasers of such bonds from A. and B. were not affected by this decree.

3. Whether certain contracts in this case, between the city and A. and B. were affected by fraud, actual or constructive, arising out of the fact that A. and B. had originally occupied the status of confidential agents and advisers of the city, for the negotiation and sale of bonds, and afterwards became purchasers thereof from the city—discussed, but not decided.

November 13th, 1884. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

APPEAL from the Court of Common Pleas, No. 2, of *Allegheny county*. In Equity: Of October and November Term, 1884, No. 221.

This was a bill in equity, filed January 25th, 1884, by William E. Schmertz and twenty-nine others, citizens and taxpayers of the city of Pittsburgh, on behalf of themselves and other citizens and tax-payers who might come in and contribute to the expenses of the suit, complainants, and the city of Pittsburgh, its Mayor, Controller and Treasurer, and Henry Whelen, Wilson McCandless and John D. Scully, defendants.

The bill averred that the city of Pittsburgh, by its councils or a sub-committee thereof, acting in pursuance of certain Acts of Assembly and ordinances of councils, hereinafter particularly referred to, had contracted to sell to the defendants, Whelen, McCandless and Scully certain five per cent. thirty year bonds of said city, to be issued, to the amount of $6,000,000, the sale being nominally "at par," but the defendants to be allowed a "commission" of one per cent. on the price, thus in effect making the transaction a sale at less than par.

The bill averred that the transaction was invalid, and prayed an injunction restraining the execution of said contract, and a decree declaring that certain supplementary Acts of Assembly are unconstitutional, said ordinances invalid, and said contract void.

Separate answers were filed by the city, and the defendants Whelen, McCandless and Scully, asserting the validity of said contract, &c.; and the cause was referred to an Examiner and Master (S. A. McClung, Esq.,) who reported that the bill should be dismissed. Exceptions filed to his report were sustained by the court, and a decree was entered awarding an injunction as prayed for, and declaring the said contract void; from which decree this appeal was taken.

The principal questions in the case were (1) whether said contract was ultra vires (2), whether it was fraudulent (3), whether the complainants had a standing to demand an injunction. The Master found that the contract was not ultra vires; that there was no actual fraud; that there was, however, constructive fraud in the procurement of the contract which rendered it voidable; that the city had not ratified the contract; that the city was entitled, at its option, to disaffirm it, and that until the exercise by the city of such option, the complainants, as individual citizens, were not entitled to a decree restraining its execution.

The court below found as a fact that there was actual fraud in the procurement and making of the contract, which ren-

dered it void, and that the complainants were entitled to an injunction as prayed for.

The facts material to an understanding of the case, as found by the Master, were, in substance, as follows:

Owing to various causes the financial credit of the city of Pittsburgh in the years 1877–78 was bad. The bonded indebtedness of the city had increased from less than four millions of dollars in 1870 to more than fourteen millions in 1878–79. With the exception of $300,000 *six* per cent. gold bonds, all the bonds issued after 1870 bore *seven* per cent. interest. The city had disputed its liability as to certain of its bonds, which had resulted in litigation and a final decree was made establishing its liability, and a mandamus was awarded requiring it to make provision for payment of interest thereon (Commonwealth ex rel. Whelen *v.* Councils of Pittsburgh, 88 Pa. St. 66, decided November 18th, 1878).

In February, 1879, an effort was made by the city authorities to negotiate a loan with which to pay the interest then due, amounting to $1,400,000. This resulted in the taking in March, 1879, by or through the banks of the city of "Temporary Loan" six per cent. five year bonds, to the amount of $1,405,000 at par, less a commission and accrued interest together equivalent to one per cent. The subscriptions were in excess of the amount of this loan.

At this time (1879) the outstanding "Street Bonds" amounted to about $5,200,000, of which about $700,000 matured in 1883, $55,000 in March, 1884, and the remainder between October 1, 1884, and April 1, 1886. With a view towards meeting or refunding these liabilities, the councils of the City of Pittsburgh procured to be passed by the legislature of Pennsylvania an Act, approved May 9th, 1879, entitled "An Act authorizing cities of the second class to issue bonds to an amount equal to the Street Bonds and Temporary Loan Bonds now outstanding, not exceeding six millions of dollars, for the purpose of retiring or paying Temporary Loan Bonds and Street Bonds." This Act provided, Section 1, "That the councils of any city of the second class may, by ordinance, authorize the making, execution and negotiation of bonds to an amount not exceeding $6,000,000," for the sole purpose of paying off Street Bonds and Temporary Loan Bonds; "the said bonds shall bear a rate of interest not exceeding six per centum per annum, and shall be payable in thirty years from the date thereof. . . . . . The interest of the said bonds shall be payable semi-annually upon the first days of June and December, at the City Treasurer's office ; . . . . . the said bonds shall be exempt from all taxation for city

or county purposes . . . . . and they shall be known as Improvement Bonds." Section 3 provided : " the said Improvement Bonds . . . . . *shall be sold at not less than par, with accrued interest, but the said councils may allow a reasonable compensation for the sale or negotiation of the said bonds.*" Section 5 provided for a sinking fund for the redemption on December 1st, of each year, of three and one third per centum of the total amount of said bonds then issued, until the said bonds are retired.

On January 12th, 1880, an ordinance of councils was passed, reciting the above Act, providing for the issuing of said Improvement Bonds, and that the same " shall bear interest not exceeding six per centum per annum, free from *all* taxes, payable semi-annually, . . . . . at the agency in the city of Philadelphia, or at the Treasurer's office in the city of Pittsburgh, as the holder thereof shall request." The said bonds " may be issued . . . . . under the management and control of the finance committee, or sub-committee thereof, as the same shall direct. The said Improvement Bonds shall not be sold at less than par and accrued interest, and the said finance committee or sub-committee thereof may allow a reasonable compensation for the negotiation, sale or exchange of the said bonds, and may bind the city for the compensation, which the finance committee or sub-committee thereof are hereby authorized to determine."

The finance committee of councils appointed a sub-committee of four, with full power to negotiate, sell or exchange said loan, who, on April 3d, 1880, entered into a contract with Henry Whelen and Wilson McCandless (known in this case as the " First Arrangement," Exhibit C.), whereby, after reciting the above Act and ordinance, it was agreed " that the city of Pittsburgh, acting by and through the said sub-committee of the finance committee, in consideration of the services to be performed by the said Wilson McCandless and Henry Whelen, in the negotiation, sale or exchange of said loan, and hereinafter more particularly defined, hereby covenant and agree to and with the said Wilson McCandless and Henry Whelen to allow them as compensation for services in the refunding of the Street and Temporary Loan indebtedness of said city by the negotiation, sale or exchange of the said loan as follows: First, For the sale or exchange of new six per cent. thirty year loan, free of taxation, a commission of one per cent. Second. For the sale or exchange of new five per cent. thirty year loan, free of taxation, an additional compensation of one per cent." In consideration whereof said McCandless and Whelen covenanted and agreed " to negotiate,

sell or exchange said loan," under the supervision and direction of said sub-committee, on the following terms: "First. That said Wilson McCandless and Henry Whelen shall have exclusive control of the negotiation. Second. That the committee shall and does hereby agree to procure such legislation as will authorize the city to adjust the difference in the interest between new and old bonds up to the date of maturity of old loans, and also to authorize the city to issue new loan for a specific term of years, with a modification that the bonds cannot be called in by the city before maturity. . . . . . It is also agreed that the six per cent. loan shall not be placed, unless found impracticable to place a new five per cent. loan within ninety days of the maturity of the bonds to be funded, and due notice in writing to be given to the sub-committee in that event."

The sub-committee of the finance committee of councils procured to be passed by the legislature, approved March 11th, 1881, a supplement to the Act of May 9th, 1879, which provided, Section 1, that in the payment or exchange of the Street and Temporary Loan Bonds under the provisions of the original Act, " the councils of the cities of the second class shall have full power to adjust the interest to the date of the maturity of such bonds, and the amount of money necessary for that purpose shall be payable either out of the proceeds of said bonds or out of any funds in the treasury of any such city over the investment of which said councils may have control, or in such other manner as said councils may direct."

Section 2 provided " that the fifth section of the Act of May 9th, 1879 " [which section provided for the annual retirement of three and one third per cent. of the bonds issued], " shall be and the same is hereby repealed ; " and provided that in lieu thereof councils should at each time of levying municipal taxes and making annual appropriations, set apart and appropriate from the general revenues of the city a sum sufficient to pay the interest on said bonds during the fiscal year then next ensuing ; and should also set apart and appropriate out of the general revenues of the city a further sum sufficient to create a sinking fund equal in amount to three and one third per centum of the total amount of said bonds then issued, " which sum so appropriated shall be used for the retirement and cancellation of said bonds, and for no other purpose." Section 3 provided for the investment of the moneys in said sinking fund, in certain securities, &c.

On March 24th, 1881, councils passed a supplement to the original ordinance of January 12th, 1880, reciting the above supplementary Act, and accepting the same, and providing that the city officers and said sub-committee should act in

accordance with the modifications thereby effected, including the adjustment of interest on bonds so retired to the date of maturity; and providing, Section 4, "The interest on the bonds issued by virtue hereof shall be free from any deduction for taxes."

Thereupon the said sub-committee on March 23d, 1881, entered into an additional or supplementary contract with said Wilson McCandless and Henry Whelen (known as the "Second Arrangement," Exhibit E) reciting the former contract, the supplementary Act, and the supplementary ordinance, and providing, in order that said original contract may be made to conform thereto: " That the new five per cent. bonds shall be made payable in thirty years, and shall be issued to Whelen and McCandless in exchange for all Temporary Loan and Street Improvement Bonds presented by them, at par and accrued interest, and in such exchange all excess of interest on old bonds exchanged or refunded to the date of the maturity thereof shall be adjusted and provided for.    That all bonds *purchased* by Whelen and McCandless under the provisions of the original and this supplementary contract shall be furnished to them at par and accrued interest."

On April 15th, 1881, a further supplement to the said Act of May 9th, 1879, was approved (P. L. 11), repealing the second section thereof, which is not material to be referred to, further than to say that the effect of both supplements to said original Act was to make the said Improvement absolutely thirty years in duration.

On May 14th, 1881, said sub-committee entered into a further or supplementary contract with said McCandless and Whelen (known as the "Third and Final Arrangement," Exhibit F) which is here given in full, to wit:—

*Whereas*, By an Act of Assembly, entitled "An Act authorizing cities of the second class to issue bonds to an amount equal to the Street Bonds and Temporary Loan Bonds now outstanding, not exceeding $6,000,000, for the purpose of retiring or paying Temporary Loan Bonds and Street Bonds," approved 9th day of May, A. D. 1879, and an Ordinance passed by councils January 13th, 1880, the finance committee or sub-committee thereof, of the councils of the city of Pittsburgh, was authorized to negotiate, sell or exchange Improvement Bonds of the city of Pittsburgh to an amount not exceeding $6,000,000, for the purpose of redeeming Street and Temporary Loan Bonds; and,

*Whereas*, On the 1st day of April, 1880, there matured of such outstanding bonds the sum of $141,000, the sub-committee of the finance committee of the councils of the city of

Pittsburgh, acting through the city controller, did, in the month of March, 1880, advertise in the official papers of said city for proposals to take bonds at par, bearing interest at the rate of four, four and one half or five per cent., to be issued under the provisions of the Act and ordinance before mentioned; and,

*Whereas*, No bids were received by the city controller or sub-finance committee in response to said advertisement, at any of the rates of interest as enumerated, and as it was demonstrated to be impracticable in that manner to place bonds bearing the rates of interest as aforesaid, the said sub-committee applied to Henry Whelen, of the city of Philadelphia, and Wilson McCandless, of the city of Pittsburgh, for bids to purchase the bonds made necessary to be sold to meet the said indebtedness maturing April 1st, 1880, to which application the said Henry Whelen and Wilson McCandless made response by proposal of date April 3d, 1880, to take the entire loan under the condition therein set forth; and,

*Whereas*, The sub-committee entered into a contract with Henry Whelen and Wilson McCandless of date April 3d, 1880, whereby the proposition of said Henry Whelen and Wilson McCandless was accepted. (Copies of said proposal and contract of 3d April 1880, hereto attached, more fully describes their terms and conditions;) and,

*Whereas*, By supplemental contract of date 23d of March, 1881, it was agreed that the new five per cent. bonds should be made payable in thirty years from date of issue, and should be issued at par and accrued interest to Whelen and McCandless in exchange for Street Improvement Bonds and Temporary Loan Bonds presented by them, and that in such exchange all excess of interest upon all bonds exchanged or refunded to the date of maturity thereof should be adjusted and provided for.

Now, therefore, this agreement witnesseth that in consideration of the covenants and agreements hereinafter contained, it is agreed by the city of Pittsburgh, acting by and through the sub-committee of the finance committee of the councils of said city, and Henry Whelen, of the city of Philadelphia, and Wilson McCandless, of the city of Pittsburgh, their heirs, executors or administrators, that the terms and conditions of said original and supplemental contracts shall be, and they are hereby ratified and approved, subject to the modifications hereinafter contained.

The city of Pittsburgh sells at par and accrued interest to Henry Whelen, of the city of Philadelphia, and Wilson McCandless, of the city of Pittsburgh, $6,000,000 of the Improvement Loan Bonds, authorized by Act of 9th day of

[Appeal of Whelen.]

May, A. D. 1879, and its several supplements, and ordinance of councils of January 13th, A. D. 1880, and its several supplements, under the following conditions, viz.:—

First—The said bonds shall have thirty years to run from date of issue ; shall bear interest at the rate of five per cent. per annum, payable semi-annually on the first days of June and December; shall be free from deductions on account of taxation.

Second—That the bonds to be issued shall be engraved and delivered in such amounts in any one year as may be required to make payment in money by their sale or otherwise, to be delivered in exchange for bonds refunded, and shall be issued either coupon or registered bonds, in owners' names, and shall be convertible from registered to coupon, or coupon to registered, at the pleasure of the holder, in sums of $1,000 each, and the registered bonds shall be transferable at the pleasure of the owner, in multiples of $100.

Third—That for all Street Improvement Bonds or Temporary Loan Bonds presented by Whelen and McCandless, prior to maturity, the said Whelen and McCandless shall be furnished new five per cent. thirty-year bonds at par and accrued interest, and in such exchange all excess of interest upon old bonds exchanged or refunded to the date of the maturity thereof, shall be adjusted and paid to the said Whelen and McCandless.

Fourth—That Whelen and McCandless shall have the privilege to pay into the city treasury, sixty days prior to the maturity of any of said Street or Temporary Loan Bonds, a sum sufficient to meet the said maturing loans or any part thereof, and the city controller is authorized and directed at the time of such payment, to furnish Improvement Bonds to said Whelen and McCandless to an amount equal to such payments into the city treasury, and the said Whelen and McCandless are required to pay into the city treasury, at least thirty days prior to the maturity of any of the said Street or Temporary Loan Bonds, a sum sufficient to meet such maturing loans, and the city controller shall, at the time of such payment, issue Improvement Bonds equal in amounts to such payments.

Fifth—Whelen and McCandless agree that until the outstanding Street and Temporary Loan Bonds have all been refunded or payment made to the city treasury of sums sufficient to pay off and redeem the same, that they will furnish to the city of Pittsburgh, at par and accrued interest, enough five per cent. thirty-year Improvement Loan Bonds sufficient to meet the requirements of the sinking funds now authorized and required by the Act of 9th of May, A. D. 1879, and its several supplements.

Sixth—That the bonds to be furnished Whelen and Mc-Candless, under this agreement, shall be dated 1st of June or 1st of December, next preceding the date of being furnished to Whelen and McCandless.

Seventh—That Whelen and McCandless shall be allowed a commission of one per centum upon all bonds purchased or exchanged by them under the provisions of this agreement. The said commission to be allowed in adjustment of accrued interest, or paid by city warrant if such accrued interest should not be sufficient to meet the said commission.

Eighth—That this contract shall remain in full force until the outstanding Street and Temporary Loan Bonds are refunded, or money paid into the city treasury sufficient to pay off all of such indebtedness of the city of Pittsburgh.

Witness the signatures of the sub-committee of the finance committee of councils of the city of Pittsburgh, and the hands and seals of the said Henry Whelen and Wilson Mc-Candless, this 14th day of May, 1881.

On May 16th, 1881, Messrs. Whelen and McCandless notified the sub-committee that they had associated with them Mr. John D. Scully. This action was approved, and these three gentlemen composed what was thereafter known as the "syndicate."

No Street or Temporary Loan Bonds matured until 1883. In December, 1882, however, the syndicate presented $77,000 in Street Bonds (not due) and had them exchanged for Improvement Bonds under the above recited legislation and contract. In 1883 the syndicate presented $79,000 of matured bonds, and insisted upon and had issued to them Improvement Bonds therefor, notwithstanding the Controller had money in the sinking fund sufficient to redeem all the bonds maturing in that year, amounting to $700,000. The Controller did redeem all said bonds, except the said $79,000, and the syndicate permitted the Controller to cancel the Improvement bonds to that amount issued to them as above stated. The Temporary Loan Bonds, $1,405,000, matured January 1st, 1884. In the meantime, about November, 1883, the contract with Whelen and McCandless had been published in the Pittsburgh newspapers, and before any of the Improvement Bonds were issued for the Temporary Loan Bonds, one or more of the plaintiffs called upon the Controller, and advised him that it was against the interest of the city to issue the bonds under the contract. The Controller, not having money in the proper sinking fund sufficient to pay the maturing bonds, issued Improvement Bonds bearing date December 1st, 1883, to the syndicate in December, 1883, the syndicate having

previously deposited the money therefor with the City Treasurer. The syndicate was allowed a commission of one per cent. on the bonds so issued.

The plaintiffs then, on January 25th, 1884, filed this bill to restrain the further execution of the contract, &c.

The Master reported, inter alia: "The grounds of the plaintiffs attack may be stated and discussed under the following heads: ·

1. The Acts of March 11th, and April 15th, 1881, are unconstitutional.

2. The city councils have no power to enter into contracts as to matters beyond the term of the life of such councils.

3. Councils had no power to delegate the making of this contract to a committee, as was done under the ordinance in question.

4. The bonds were really sold at ninety-nine per cent., while the Act of Assembly requires that they shall be sold at par; were sold free from all taxation, and interest is made payable either at the treasurer's office or at the agency in Philadelphia, whilst the Act provides they shall be free only from city and county taxation, and the interest shall be payable at the treasurer's office.

5. The contracts with the syndicate were actually fraudulent.

6. That there was constructive fraud in the obtaining by the syndicate of the final agreement dated May 14th, 1881. ·

The ground of the first objection was that the said supplementary Acts were obnoxious to section 6, of Art. III. of the Constitution, which provides that "No law shall be revived, amended or provision thereof extended or conferred by reference to its title only; but so much thereof as is revived, amended, extended or conferred shall be re-enacted and published at length"—in that said supplement purported to amend and in part repeal the orginal Act, without publishing the original Act, or the repealed sections thereof at length. The Master reported that in his opinion said supplements were not unconstitutional on the ground stated. The Master further held that councils had the power to enter into such contract, notwithstanding it related to matters beyond the life of the then councils; and that councils had power to delegate the making of such contract to said sub-committee. Further, that although the contract purported to sell the full amount of $6,000,000 of bonds, while the Act and ordinance provided only for such amount, not exceeding that sum, as may be necessary to pay maturing bonds, yet the terms of the contract were subordinate to those of the Act, and the latter

were binding on the syndicate, and no other parties could ever have higher rights. " In addition to this the Master understands that the City Controller will not permit bonds to issue when the city has money from other sources. The fact is, when the contract itself is read in the light of the Act and ordinance authorizing it, its language may be made to accord with both in this respect. The syndicate now concede that they are not entitled to bonds when there is money in the sinking fund, to pay maturing street indebtedness."

As to the question whether the contract was invalid because it allowed the syndicate one per cent. commission upon their purchase, thereby, in effect, making the sale of the bonds at less than par, contrary to the provision of the Act, the Master reported: " The primary purpose of the provision in the Act—'they shall be sold at not less than par, with accrued interest, but the said councils may allow a reasonable compensation for the sale or negotiation of said bonds'—was to provide a safeguard against a sacrifice of the bonds. The authority to allow a compensation is put as a proviso to the requirement of a sale at par. Does not this indicate that it was regarded as relaxing the stringency of the first clause, and did it not therefore contemplate some such case as arose ? If the city sold through an agent that had to do with the transaction *only* as an agent, it did not require an Act of Assembly to make it liable to pay him a reasonable compensation for his labor. . . . . . However this may be, if this syndicate acted in good faith under the arrangements which made them agents of the city, and finally openly bought the bonds themselves for a price higher than, or as high as could be obtained from any other party, upon condition that they were paid for their services, the allowance to them of a reasonable commission does not violate the spirit or indeed the letter of the injunction against selling below par, and that is all that is involved in this proposition. If the contract is not destroyed by other causes this will not affect its existence."

The Master was further of opinion that the provisions in the contract with respect to exemption from all taxation, and for payment of interest either at the treasurer's office or in Philadelphia, were subordinate to the provisions respecting the same subjects in the Act, and if materially in conflict therewith, they would amount to nothing, and the provisions of the Act, which were notice to the syndicate and to purchasers, would govern.

Upon the questions of fraud, actual or constructive, the Master reported, inter alia, as follows :

1. " *Actual fraud.* Was there actual fraud in the making of the contract of March 14th, 1881? Did the sub-finance com-

mittee collude with Whelen and McCandless to defraud the
city, or did Whelen and McCandless actually and wickedly
deceive and impose on said committee and thus secure a con-
tract unfair towards the city? In determining this we
endeavor to put ourselves in the position of the parties who
negotiated the contract at the time of the transaction. If it
was honest then, it is honest now without regard to who has
made or lost money by it, or how much."

The Master then reviewed the testimony as to the state of
the credit of the city in the early part of 1879; the current
rates of interest; the difficulty, if not impossibility, of placing
so large a loan in Pittsburgh, or elsewhere, by the unaided
efforts of the sub-committee, " who were not trained financiers
but simply business men of the city of Pittsburgh whose
knowledge of finance was confined to home limits;" the cir-
cumstances attending the successful negotiation in Pittsburgh
of the $1,400,000 temporary loan six per cent. five year bonds;
the legislation and ordinances preceding the contract; the fact
that the contract was not made public, either by report to
councils or by furnishing it in response to requests of reporters
of the public press, for more than two years and a half after
its execution; the fact that "the bonds were all sold at from
105 to 109 and are steadily advancing in price;" the fact
that there was no evidence of corruption, and that no one
other than the syndicate had any interest in the profits of
the contract; that "the syndicate have not been shown to
have made any misrepresentations as to facts, nor to have
withheld any information as to any subject concerning which
they were asked. On the contrary they seem, regarded as
mere ordinary purchasers, to have been unusually candid in
their dealings with the city."

And the Master found as a fact, " that *no actual fraud* on
the part of any one in the procurement or execution of the
contract of May 14th, 1881, has been proven."

2. As to the question of constructive fraud, the Master
reported as follows:

Considering the position which Mr. Whelen occupied, repre-
senting the holders of the Street Bonds in the litigation which
culminated in the decree in Whelen *v.* The Councils, he pos-
sibly might have driven a very hard bargain with the city
when first brought in contact with the sub-finance committee
in 1880. Had he proclaimed her unworthy of credit, she
might have had very great difficulty in entering the eastern
markets. At all events had he and Mr. McCandless chosen
to assume no confidential relations towards the city, they
would have had no difficulty in sustaining the contract which
they finally did make in 1881. But they did not stand at

arm's length. They, on April 3d, 1880, accepted employment by the city as agents to negotiate those very bonds which they afterwards purchased. (The intermediate contract of March, 1881, may be excluded from consideration. It either simply continued the agency at a reasonable commission or it gave the syndicate the advantages without the responsibilities of a purchaser. In the former case it made no material change, and in the latter the principles which affect the purchase by an agent would equally affect the procurement of such an agency.)

What effect did this employment have upon the contract of May, 1881? It changed the burden of proof. It set up a different standard of duty for the purchasers. The law does not criticise the morality of the man in the parable who bought the field containing the hidden treasures without making known their existence, but it assumes two things: First, That he did not lie in response to questions asked him concerning unknown values, and, second, that he was not an agent of the owner for the sale of the land when he discovered the treasure and made the purchase.

In this latter case it was his duty to reveal all he knew, and he could not sustain his purchase without showing affirmatively that he had revealed everything he knew, and dissolved the relation or put the principal upon his guard against the agent himself.

The well-known case of Fox *v.* Mackreth is usually referred to as having established the rule ever since recognized and acted upon by courts of equity, viz.: "That a purchase by a trustee for sale from his cestui que trust, although he may have given an adequate price, and gained no advantage, shall be set aside at the option of the cestui que trust, unless the connection between them most satisfactorily appears to have been dissolved and unless all knowledge of the value of the property acquired by the trustee has been communicated to his cestui que trust." "It is founded," observed Lord ELDON "upon this, that though you may see in a particular case that the trustee has not made advantage, it is utterly impossible to examine upon satisfactory evidence in the power of the court (by which I mean in the power of the parties) in ninety-nine cases out of a hundred whether he has made advantage or not:" White and Tudor's Leading Cases, vol. 1, part 1, page 212; Ex parte Lacey, 6 Vesey, 627. "The circle of the rule is extended to include special agents, commissioners of bankrupts, assignees of bankrupts, solicitors of commissions, auctioneers, creditors who have been consulted as to the mode of sale, attorneys and solicitors, and others holding similar relations of confidence:" Opinion of BELL, J., in Beeson *v.* Bee-

son, 9 Barr 284, and cases cited. "If persons having a confidential character were permitted to avail themselves of any knowledge acquired in that capacity, they might be induced to conceal their information and not to exercise it for the benefit of the persons relying on their integrity:" 2 Sugden on Vendors, 8 Am. Ed. p. 688. "In all cases of this sort the principal contracts for the skill and judgment of the agent, and the habitual confidence reposed in the latter makes all his acts and statements possess a commanding influence over the former:" 1 Story's Equity Jurisprudence, § 315. "The purchase will be set aside at the instance of the cestui que trust and a re-sale ordered on the ground of the temptation to abuse, and of the danger of imposition inaccessible to the eye of the court:" WAYNE, J., in Michoud v. Girod, 4 Howard 557. See cases collected in notes to Fox v. Mackreth, 1 W. & T. Leading Cases in Equity, 188. A trustee purchasing from his cestui que trust must show that he made the fullest disclosures of all he knew as to the subject, and that the price he paid was adequate:" Spencer's Appeal, 30 P. F. S. 317. An attorney dealing with a client is bound to advise the client as against the attorney himself: Story's Equity Jurisprudence, § 312 a. See also Shoemaker v. Stiles, 14 Pittsburgh L. J. 59.

There is no absolute rule that a trustee or agent cannot buy from his cestui que trust or principal. The transaction is only voidable. Many, perhaps most of the cases, hold it voidable at the mere option of the principal, none stop short of holding it voidable, unless the purchaser show affirmatively *uberrimam fidem*, which includes not only information as to the facts, but such advice as was due from one in his position to the party from whom he was purchasing.

A lawyer who proposes to deal with his client as to that concerning which he has been employed, does not fulfill the measure of his duty when he informs him of all the facts of which he has possession, leaving him to draw his own legal conclusion. And certainly the same rule applies to any one whose employment involves professional skill or knowledge. In the case in hand there was manifestly no severing of the relation of principal and agent, existing between the city and the syndicate. The very contract recites this agency. There is no evidence anywhere of notice by them to the committee—"you must look out for us—it is now every man for himself." The relation then existed on May 14th, 1881, in full force.

Did the syndicate then perform all the duties which were imposed upon them, or rather have they shown affirmatively that they did? For if there is any failure to show it, we must presume that they did not. It is certainly reasonable to assume that men will not do that for another against their

own interest which they do not regard as required of them by duty.

Mr. Whelen testifies, on pages 298 and 299, that he did not think his firm purchased any of these bonds prior to the final arrangement of May 14th, 1881, because "it would not have been a wise thing on our part," and when asked "why it would not have been a wise thing?" he answers—"Why, after I became the owner of a lot of bonds of course it would be to my interest to put the price of these bonds up, if I could, and not before, and that is true of all marketable securities." Now, giving Mr. Whelen credit for acting up to what he believed to be the measure of his duty to the city, as we have done, we are compelled to conclude that he misapprehended his real position, and regarded himself simply as a possible purchaser of these bonds, and as such bound to do nothing to enhance their value.

But, say defendants, both McCandless and Whelen testify that they made known all the facts within their knowledge to the syndicate. It appears, however, that nothing was said about the sale of five per cent. Pittsburgh bonds by Mr. Whelen to the Dollar Savings Bank in November, 1880, and, although Mr. Ford says he knew of the sale, yet the circumstances should be noted. It does not appear that he pointed out to the committee the quotation of the same bonds in July, 1880, at above par by his own house. The sale of $34,000 of Pittsburgh five per cent. R. R. Compromise Bonds, in February, 1881, at 107 to 108, and re-sale at an advance, were private, and were not known to these parties, but we must not shut our eyes to the fact that these gentlemen were employed by the city as financiers, and dealers in bonds by profession, and if the market price of five per cent. bonds was such as to justify sales of this sort it was their business to know it, and we must assume that they did know it.

Besides, the city contracted for their skill and professional knowledge, just as much as for their labor, and they were bound to do something more than present to the committee undigested facts. In case of an offer for bonds from a third party, the committee, by the agreement of 1880, certainly contracted for the benefit of their judgment and advice and was entitled to it. They would not have formed such judgment without knowing the market rates, and collecting and digesting facts in such a way as involved professional skill and experience, as for example was done in 1883, in the letter of June 16th, Ex. L. September 2d, 1884.

We have declined to charge the committee with dereliction or fault in entering into the contract, not only because they were not trained financiers, but also because they naturally

relied on Pittsburgh rates in determining what interest should
be paid, whereas the real market for these bonds was in the east.
We have no evidence that the peculiar condition of affairs which
caused many of our local financiers to look for a rise in the
rate of interest here, applied to the east.   Yet the city had
contracted for and was entitled to the judgment of an eastern
financier, the scope of whose vision was wider than theirs.

Certainly this contract, in the eyes of an experienced man
like Mr. Whelen, could only have been considered wise on the
part of the city in case there was a reasonably well-grounded
fear of higher rates for money prevailing in the future.   In
the light of the facts which we have, there was no such fear
in the eastern money markets, and with these Mr. Whelen
was acquainted.   If he had advised the committee solely in
the interest of the city, as his position made it his duty to do,
would he not have pointed out the peculiarity of our home
market; and advised that the wiser course was to wait and
take the chances of the future?   We, of course, cannot con-
clude that because an agent considers a contract advantageous
to himself, he must consider it disadvantageous to the other
party.   This depends largely upon the nature of the transac-
tion, however.   And this seems to be one that Whelen and
McCandless would scarcely have gone into had it not been
very evident to them that the bonds would advance in price.
It is said that they had a right to take chances.   But they
would not take chances the majority of which were against
them; and we must remember that the city, representing tens
of thousands when they represent but hundreds, could prop-
erly take more adverse chances than they could.

The Master is certainly not convinced that the syndicate
advised this committee as they would have done as against a
third party offering to purchase.

To put the matter in a little different form, it does not
appear affirmatively that they put the committee in a position
to deal with them, with as little risk as with their aid they
(the committee) could have dealt with third parties.   And this
seems to have been their duty: Rogers v. Lee Mining Co., 13
Reporter 39, and cases cited.   It is absurd to hold an attor-
ney to such a rule as this and not apply it to other parties
occupying exactly analogous positions.   It is true that an
attorney, whose professional qualifications involve a knowl-
edge of the rule in question, might be held guilty of actual
fraud in a case like the present, where another party could
only be charged with constructive fraud, but that does not
affect our conclusion here.

The primary purpose of the rule is not the discovery of
fraud; it is the absolute prevention of dealings of this sort

12 OUTERBRIDGE—12

between trustèe and *cestui que trust*, principal and agent, attorney and client.   This is not a case for its relaxation.   In the first place the principal is represented by a committee who have comparatively little personal interest in the matter.   Then the agents employed had doubtless special influence over their principal.   As we have seen, Mr. Whelen was probably (almost certainly) employed, because he was considered the one man who could obtain access for the city to the eastern money markets.   The very fairness and forbearance with which he had treated the city before, added to his influence without doubt; he, if he had chosen to stand aloof, could have fairly and honestly used his existing advantages for his own benefit, but when he added to them the additional one of being the agent and advisor of the city, they all became the property of the city.

A shake of the head by Mr. Whelen, or a shrug of his shoulder, might cause the committee to yield almost any point, impressed as they were with the magnitude and difficulty of their task.   Nothing affords a sufficient safeguard against imposition in such case save a rule which denies binding force to the bargain. or at least requires a degree of affirmative proof of fair dealing which does not appear in this case.

The contract, however, is not absolutely void.   It may be ratified.   But the requirements are strict.   The party who affirms or ratifies such contract must do it with his eyes open. · He must do it with a knowledge that as to him it is an impeachable contract.

" To render the ratification of such sale effective and conclusive,*the principal must at the time of the ratification be fully aware of every material fact, and his act of ratification be an independent substantive act, founded on complete information, and he must not only be aware of the facts, *but apprised of the law as to how these facts would be dealt with if brought before a Court of Equity :* " The Hoffman Coal Co. *v*. The Cumberland Coal and Iron Co., 16 Maryland 456.

It will not do to permit a party to use his position to obtain the contract and then use the contract to influence the other party to do acts which will amount to ratification.   It is, of course, true that from mere length of time ratification may be inferred, but that is because such time has elapsed that the court presumes both knowledge and acquiescence.   How stand the facts in the present case ?

Councils have approved a report which refers to this contract and speaks of it as a wise one at the time.   But did not both the committee who made that report and the councils look upon and deal with that contract as one then binding upon

the city ? Is there any evidence anywhere that they were informed that they were free either to ratify or disaffirm ?

Looking upon it as a binding contract they would have been fools to pass a resolution saying that they did not like it, because in that case it made no difference whether they liked it or not. There is no evidence that up to the present time the city has ever been informed that she had any grounds for relief against the contract save upon proof of actual fraud or upon the other grounds upon which we have passed. She has always when acting, acted under the thraldom of the original contract. The other parties to the contract have never put her to her election.

It has been frequently held that acts which in other cases would amount to full ratification, have no such effect in a case such as this. In Rosenberger's Appeal, 2 Casey 67, it was held that the acceptance of a part of the proceeds of the sale would not estop the *cestuis que trustent* from claiming an advance on the sale from the trustees. The same doctrine was held in Campbell *v.* McLain, 1 P. F. S. 200. These cases in this respect probably modify somewhat Beeson *v.* Beeson, 9 Barr 279. Ashhurst's Appeal, 10 P. F. S. 290, simply recognizes the doctrine that acquiescence may be presumed from delay. Courts of Equity will not adopt as a bar a period less than the period which bars a title at law, in the absence of circumstances which affect the particular case. Cases cited in White and Tudor's Leading Cases, vol. 1, part 1, pp. 258, 259.

Six years have not elapsed here and we see no such circumstances as would work an estoppel. The purchasers had as full knowledge as to their legal rights as the seller, and they have done nothing for which they cannot be readily compensated. The argument that the contract is attacked because the bonds have risen in price goes for naught, of course this increases the inducement, although it seems pretty clear that they were worth more than par in May, 1881. The agents by entering into such a contract put the city in such position that it could take advantage of this contingency. It certainly would not exercise what was a mere option unless it was to its advantage to do so. The proceeding to disaffirm in Fox *v.* Mackreth was avowedly instituted because Mackreth had sold at a large advance.

The Master finds :

First. That on the 14th day of May, 1881, the then members of the syndicate, Whelen and McCandless, occupied a confidential relation towards the city of Pittsburgh, being employed by her as brokers and financiers, and as such given the exclusive control of the sale of her Improvement Bonds,

and that said relation still existed when they themselves purchased said bonds.

Second. That said syndicate have not shown that before making said purchase they communicated to the officers of said city, with whom they were dealing, all the facts and circumstances pertaining to the question of the value of said bonds, and necessary in order to determine the advisability of the making of said contract of May 14th, 1881, by the city as fully as they (the members of said syndicate) possessed them.

Third. That said syndicate have not shown that they gave to said officers of said city the benefit of their skill and judgment as financiers upon the question as to whether or not it was to the interest of the city of Pittsburgh to execute said agreement of May 14th, 1881.

Fourth. That said city has not ratified said contract of May 14th, 1881.

He is therefore of the opinion *that the city of Pittsburgh has the right to disaffirm said contract of May* 14th, 1881.

As to the question of the status of the plaintiffs and their right to the decree sought by the bill, the Master reported, inter alia, that " as the case stands the city may either disaffirm or hold the syndicate to the agreement. . . . . . Until that option is exercised it remains a contract, and no one is entitled to a decree restraining its execution. . . . . . Remembering that at the time of filing the bill the contract was in full force, that it is so now, and will remain so until the city, through its representatives, exercises its discretion and elects to hold itself freed from its obligation, is there any decided case or any principle which will authorize us either to permit these plaintiffs to decide for the city what she shall do in the premises, or ourselves decide it for her, and then decree that the contract no longer exists ? Let us admit that if the city councils fraudulently refuse to exercise an option in the city's behalf that the tax-payers can file their bill, and having shown the fraud, obtain such decree as would have been proper in case such option had been exercised (and the principle probably requires this), still we have not reached the case in hand. . . . . . Had this bill been filed by tax-payers simply alleging that the city had a contract, which it could by election be relieved from, and which was a burden injurious to it, but admitting that councils had not been in any way called upon to act, nor informed that they could disaffirm, certainly the bill would be demurrable. Have we not reduced this bill to just that condition ? . . . . . To enter a decree here simply lops off the second branch of the alternative—the right of

councils to affirm the contract. With the councils must rest the responsibility."

The Master's conclusion was that " the bill should be dismissed and defendants Whelen, McCandless and Scully should pay the costs."

The plaintiffs filed exceptions to the Master's report, inter alia, as follows :

*Fifth.* The Master erred in not finding that the sale of bonds made to the syndicate by the contract of May 14th, 1881, was a sale at one per cent. below par, and therefore illegal and void.

*Sixth.* The Master erred in not finding that the issuance of the bonds, free from all taxation and with interest payable at Townsend, Whelen & Co.'s, in the city of Philadelphia, was unauthorized by any legislation, and in not finding that the issue of such bonds should be restrained.

*Seventh.* The Master erred in his finding as follows, viz.: " The Master finds as a fact that no actual fraud on the part of any one in the procurement of execution of the contract of May 14th, 1881, has been proven."

*Eighth.* The Master erred in not finding from the evidence that the contracts of April 3d, 1881, March 23d, 1881, and May 14th, 1881, between the syndicate and the sub-committee of the finance committee, were fraudulent in fact.

*Ninth.* The Master having found that there was constructive fraud in the obtaining by the syndicate of the agreement of May 14th, 1881, erred in not finding that the issue of any bonds thereunder should be enjoined.

*Tenth.* Upon his own finding the Master erred in not recommending that a perpetual injunction should issue at the instance of the plaintiffs in this case.

The defendants also excepted to the Master's report, inter alia, as follows :

*Eleventh.* The Master erred in finding " that on the 14th day of May, 1881, the then members of the syndicate, Whelen and McCandless, occupied a confidential relation toward the city of Pittsburgh, being employed by her as brokers and financiers, and as such given the exclusive control of the sale of her Improvement Bonds, and that said relation still existed when they themselves purchased said bonds."

*Twelfth.* In finding " that said syndicate have not shown that before making said purchase they communicated to the officers of the said city with whom they are dealing, all the facts and circumstances pertaining to the question of the value of said bonds necessary in order to determine the advisability of the making of said contract of May 14th, 1881, by the city,

as fully as they (the members of said syndicate), possessed them."

*Thirteenth.* In finding " that said syndicate have not shown that they gave to said officers of said city the benefit of their skill and judgment as financiers upon the question, as to whether or not it was to the interest of the city of Pittsburgh to execute said agreement of May 14th, 1881."

*Fifteenth.* The Master erred in holding " that the city of Pittsburgh has the right to disaffirm said contract of May 14th, 1881."

The following opinion and decree of the court was filed by EWING, P. J., (WHITE, J., dissenting):

This case was finally submitted to the court without argument, on the 20th of October. It being important that the case should be decided within the week, we will not undertake to review or discuss all the questions raised.

On the motion for a preliminary injunction the case was elaborately argued by counsel on both sides. At that time counsel for defendants conceded the right of the plaintiffs to maintain their action for the relief sought, if they showed either a want of authority for the contract in question, or fraud in the procuring of it. We will not, therefore, discuss the authorities on this point.

In many things we agree with the Master in his findings of fact, and in his conclusions of law; but having carefully read the entire testimony, and having given the case as full a consideration as the limited time permits, we are unable to agree with the Master on several important questions.

Plaintiffs attack the contract of 14th May, 1881, on alleged want of authority to make it.

As to the alleged unconstitutionality of the supplements of the Act of 1879, the question is not free from difficulties, but we incline to the conclusion of the Master that they are not in contravention of the 6th section of article 3d of the Constitution. We would have more hesitation in relation to the original Act. It is as plainly a special Act of Assembly as could well be conceived—passed for a special case, the only one existing, or likely to ever exist. To sustain it is going far beyond the decision of the principle laid down in Wheeler *v.* The City of Philadelphia, 27 P. F. Smith 338, and similar cases.

The Act of Assembly and the Ordinances, in our opinion, did not empower the sub-finance committee to make a binding contract for the sale of the bonds, except from time to time as needed for the proposed exchange, or for bonds falling due—it may be that the subsequent action of Councils cures the defect—we doubt it.

In several particulars the Ordinance and contract is a departure from the directions contained in the Act of Assembly. The issue of the bonds as contracted for under the Ordinance makes them free from all taxation. The Act of Assembly provides that they shall be "free from taxation for city and county purposes." The Act of Assembly directs that "the interest shall be payable at the City Treasurer's office." The Ordinance and the bonds provide that it shall be payable at the agency in the city of Philadelphia, or at the City Treasurer's office. These directions in the Act of Assembly were not without force and importance; they should have been strictly followed. The neglect shows that but little regard was paid to the Act of Assembly—standing alone they would not be sufficient to require the court to interfere with the contract.

The Act of Assembly declares that these bonds, "free from taxation for city and county purposes," "interest payable at the City Treasurer's office," "shall be sold at not less than par, with accrued interest," but the said Councils may allow a reasonable compensation for the sale or negotiation of the said bonds." Compensation for the sale or negotiation of the bonds necessarily implies an agent or employee of the city to sell to others—one who shall use his best endeavors and influence to sell for the best practicable price, for the benefit of the city. If he sells above par, the excess goes to the city.

A man cannot negotiate with himself. The contract is an unequivocal, absolute sale of the bonds to the syndicate at a discount of one per cent. below par—that one per cent. is attempted to be concealed under the thin disguise and sham of a commission. The moment the syndicate became purchasers, they ceased to be agents. If they are agents, entitled to commission, the city is entitled to the benefit of whatever they may sell the bonds for above par. It is difficult to argue a proposition which, to our minds, is so nearly self-evident. In this respect the contract is clearly in contravention of the Act of Assembly, and therefore void *pro tanto*.

The contract is an absolute sale to the syndicate of six million dollars of bonds, at 99 per cent., regardless of the fact, shown by the testimony, of the certainty that there would be a large amount of money in the City Treasury for the redemption of the Street Bonds as they fell due. The original Penn Avenue Street Bonds were but $5,125,700, the balance was for temporary loans to pay interest accruing prior to 1879—$141,000 of the latter fell due April 1st, 1880.

The Acts of Assembly still in force pledged the assessments on the property for the payment of the bonds. At the time of the contract there was at least a probability that about

$2,000,000 would be in all collected from this source—councils, the committee and the syndicate were bound to contract in view of this prospective payment. There were other sinking funds certain to be in the treasury fairly applicable to the payment or purchase of these bonds. The Master takes this view of the case, saying: "The syndicate has not the right to have a single bond except in exchange for money that is needed to pay these Street Bonds." He goes on to say that he "understands the City Controller will not permit bonds to issue where the city has money from other sources," and that he further "understands the syndicate now concedes that they are not entitled to bonds when there is money in the sinking fund to pay street indebtedness," and that therefore no interference with the contract is required on that account. In this conclusion we disagree with the Master. We look in vain, in the testimony and papers of the case, for any such pledge from the syndicate. It is not their position on argument of the case, on motion for a preliminary injunction. It was not their position taken in December, 1883, when they demanded and received the full $1,405,000 of bonds, for the Temporary Loan Bonds due January, 1884, although the city then held in its treasury, in its sinking fund, idle, over $900,000, of which over $250,000 was, by law, bound to be applied to the payment of these bonds, and, in addition, $91,000 of the bonds had been bought with money of the municipal sinking fund, and had actually been in possession of the city for months. The syndicate got the bonds at 99 per cent., returning $3\frac{1}{3}$ per cent. at par. For the balance of the money, idle, and awaiting investment, the city could not get her own bonds in the open market under 108 or 110.

An interference with the contract on this point is required, lest the syndicate should withdraw their concession, and a different controller might not refuse their demand for the full $6,000,000 of bonds.

If there was nothing more the contract might be modified, by consent of the syndicate, by eliminating the one per cent. discount, and limiting the amount of bonds to be issued to the actual amount needed.

After bonds have gone into the market it is too late to raise objections to them.

Was the contract fraudulent? We agree with the Master that the contract must be judged as of its date, 14th May, 1881. If it was honest then it is honest now. If it was fraudulent then it is the same to-day.

We further agree with the Master that the fact shown by the evidence that in November, 1883, the finance committee entered into an arrangement with the syndicate by which they

paid the money to obtain the $1,400,000 bonds by a mere credit on the books of the depositaries does not affect the validity of the contract.   It is probable that the substantial control which the syndicate has over the city deposits does, as said by one of the witnesses, enable them to consummate the whole transaction without the advancement of a dollar, and yet it would not make the contract fraudulent.   That the syndicate should be aided, so far as it is safe by the city, credit is proper if the contract is an honest one.   It seems to us that it might be assumed that in making the contract it was tacitly understood that this would be done, and yet the contract might be a fair one.

. Fraud is almost necessarily proven by circumstances; it is rarely the case that it can be proven by direct testimony.' It is often fairly inferred from the circumstances against the direct testimony of the parties implicated denying.   What are the circumstances?

That the credit of Pittsburgh for some time prior to March, 1879, had been bad, is conceded.   Her authorities had disputed the validity of over five million dollars ($5,000,000) of its bonds, and the final decision was against them.

The prompt taking of the $1,400,000 of its bonds by the banks of the city in March, 1879, was the culminating point in a complete change in the situation.   The taxpayers and the councils had accepted the situation.   The bankers, no doubt, are good citizens—they had the foresight to see that the bonds were a good investment.   The offerings were largely in excess of the amount required, and continuously thereafter commanded a premium.   The general business prosperity of the people also added greatly to the credit of the city.   These facts led to a belief in many quarters that if the holders of the Street Bonds, then having four to seven years to run, at seven per cent. interest, were offered a long bond, with lower interest in exchange, they would accept and thus relieve the city of a part of the burden of interest.

Read in the light of these facts the object of the Act of 9th May, 1879, is readily understood.   Unless a surrender of the short seven per cent. bonds could be obtained the Act could not subserve the interest of the city.   The general Act of 1874 gave ample power to issue bonds in renewal of existing bonds as they might fall due.

Nothing was done under this Act of 1879 until the introduction of the ordinance finally passed on the 13th of January, 1880.   Neither councils, nor committees, nor city officers appear to have taken any further steps toward an exchange of bonds under the terms of the Act of Assembly. No advertisement was ever made, no terms fixed or proposed

under which the holders of the seven per cent. bonds could make an exchange for the thirty-year bonds.

In the mean time, no doubt aided by the taking of the $1,400,000 city loan, the county of Allegheny through its own officers, without any intervening agent, in December, 1879, and January, 1880, had disposed of over two million dollars of its five, ten and twenty-five per cent. bonds at par, and these soon commanded a premium.

At the 1st of April, 1880, $141,000 Temporary Loan Street Bonds of the city fell due. On the 19th to 25th March preceding, the sub-finance committee had inserted an advertisement for proposals for a loan to redeem these bonds; bids to be received March 25th. The advertisement is a peculiar one. If it were intended to make a show of inviting proposals where none where desired, it would be intelligible. Of course no bids were received. This seems to have been satisfactory evidence to the committee that they could not negotiate the loan, and by the 3d of April sufficient time had intervened for them to select the agents, get proposals, and enter into the contract of that date, constituting Whelen and McCandless sole agents of the city for negotiations about the Street Bonds. None of these bonds were then due until 1883. Considering the well known state of the money market at the time, the compensation proposed was certainly liberal. Up to this time Messrs. Whelen and McCandless were entitled to treat with the city at arms length, which they certainly did.

No one could doubt and the sub-committee knew perfectly well that six per cent. bonds of Pittsburgh were in demand at a premium, and had they inquired they would have found five per cent. bonds at par; yet they contracted to pay the agents one per cent. for negotiating six per cent. bonds at par. If it be said that this covered the exchange of bonds, and procuring the surrender of the seven per cent. bonds, the committee at the same time contracted to procure legislation to take away any possible advantage the city could have in such exchange.

They contracted for legislation to have the interest adjusted on the seven per cent. bonds up to maturity, instead of until the date of exchange as in the original Act of Assembly. The agreement impliedly stipulates for a suspension of proceedings until this and the other legislation contracted for could be procured. This would necessarily take about a year.

The sub-committee procured councils to approve of the proposed legislation, sedulously concealing the fact of this extraordinary contract with Whelen and McCandless.

This new legislation was enacted 11th March, 1881, was

accepted by councils 24th March, 1881, and on the same day the second contract was made with Whelen and McCandless.

It was found that still further legislation should be procured, but certainly not to subserve the interests of the city, and the final supplement to the Act of 1879 was approved 15th April, 1881, the approval of councils having been obtained in ignorance of the contracts. On the 14th of May, 1881, the final contract was made whereby the agents to sell the bonds for a commission became the absolute purchasers of $6,000,000 bonds at 99 per cent., with the further right to present any of the outstanding bonds (7 per cent.) and receive the difference in interest at two per cent. in advance up to the date of maturity. The city, under the contract, could no longer accept an exchange of bonds offered by the holders on any terms.

This series of contracts was carefully concealed from the public, from city councils and from the general finance committee. It was not reported to the finance committee until March 31st, 1882. It was not reported to councils until 11th December, 1882. It is alleged by defendants that these contracts were at the council meetings of that date, and could have been called for, but it is not pretended that they were read or the contents made known further than the report stated them, and that not only fails to give the facts but it is calculated to mislead. They were not made public until late in 1883. Councilmen generally do not appear to have known of the series of contracts.

Under the contract of 3d April, 1880, Whelen and McCandless as agents and experts in their line of business, were bound to extreme good faith, and to use their best knowledge and endeavors to obtain for the city the highest price for its bonds.

Between the making of the contract of 3d April, 1880, and the contract for sale of the bonds to the syndicate—former agents—important changes, general and special, adding greatly to the value of the proposed bonds, had taken place.

The legislation taking away the right of the city to call three and one third per cent. of the bonds annually no doubt added to their value, at the expense of the city.

The evidence shows, that in this interval United States Bonds, State Bonds and Municipal Bonds, east and west, had largely appreciated, United States four per cents. fully ten per cent. Philadelphia, Baltimore, Chicago and St. Louis Bonds had about the same appreciation. This appreciation had been gradual, was steady and well sustained. The prosperity of Pittsburgh was very marked. The condition of her city Treasury had greatly improved. Pittsburgh five per

cents. that commanded par in April were at a premium and in demand in July, 1880. In November, 1880, Mr. Whelen himself sold them to the Dollar Savings Bank of Pittsburgh at $1.05. In February, 1881, they commanded 7 to 8 per cent. premium. Mr. Robinson says the demand was beyond the supply.

In July, 1880, $195,000 city building bonds fell due. In June the city advertised for proposals and the 5 per cent. 30 year bonds were taken at a premium ranging from $2\frac{1}{4}$ to $3\frac{1}{2}$, and before the bonds could be issued the takers re-sold at an advance. (This transaction did not come under the syndicate contract. The difference between the advertisement in this case and that of March, 1880, is suggestive.)

Allegheny county that in December, 1879, and January, 1880, had sold its five per cents. at par, disposed of its four per cents. at a premium one year later, with offerings beyond the requirements. Allegheny city four per cents. were at a premium.

It is a matter of public history—of which we have a right to take judicial notice—that early in the summer of 1881 the United States government began the call of its bonds, giving the holders the privilege of continuing them at the option of the government at three and a half per cent. interest, finally reducing it to three—and that this action was at once successful was known to every intelligent man, and was especially known to bankers and financiers. It is suggestive in connection with the date of this contract that the first call for bonds on these conditions was made by the Secretary of the Treasury, 11th of April, 1881, and the response was required on or before 10th of May, 1881, (in this connection should be read chronologically the Acts of Assembly, ordinances and contracts as set out in the appendix to the Master's report.)

The testimony shows that from the taking of the Temporary Loan of $1,400,000 in March, 1879, up to May 1881, and to the present time, no fair advertisement or call has been made for loans in Pittsburgh, for Allegheny city, for Allegheny county, for the city of Pittsburgh, or for any sound local corporation, that was not fully and promptly taken by local banks and capitalists. This is an abundant answer to the theory that the loans in question could not have been placed in Pittsburgh as the Street Bonds matured.

The evidence shows beyond a reasonable doubt, that for some time previous to and on the 14th of May, 1881, when the committee secretly sold to the syndicate these thirty year five per cent. bonds at ninety-nine per cent., the same bonds on a fair advertisement and opportunity for competition

would readily have commanded at least 105. They have not since been lower.

The question is not whether or not each of these facts taken separately is capable of explanation consistent with the honesty of the contract—taking all combined are they consistent with honesty? The contract seems to us to be "such a one, as no one informed of the facts in his senses would make on the one hand, and no fair man would accept on the other."

The syndicate knew that the sub-committee were but agents of the city. They were not dealing directly with their principal. They knew all the facts in regard to the value of the bonds, and they must have known that the sub-committee in making the contract was either ignorantly or through some favoritism giving to them an undue advantage over, and an unconscionable bargain with the city.

From the making of the contract of 3d April, 1880, to the final contract of 14th May, 1881, the interests of the city seem to have been ignored and the interests of the syndicate alone considered. There was a gross breach of trust. We deem it immaterial as to whether or not the moral vision of the parties to it was so obscured that they did not realize that it was wrong. If an attorney placed in charge of a claim of his client should, by either withholding knowledge and proper advice from his client, or by misrepresentation, succeed in procuring the claim for himself, or a friend, at half its price, it would be immaterial as to whether or not he was conscious of the wrong he was doing, it would be a fraud in fact.

In our opinion the evidence shows, and we find as a fact, that *there was actual fraud in the procurement and making of the contract*.

But even on the Master's findings of facts as to constructive fraud we are of the opinion that an injunction should issue.

He finds the syndicate guilty of constructive fraud in obtaining the contract. He finds the five per cent. bonds to have been worth more than par at the time of the contract. He also finds in relation to the bonds that of the $1,405,000 issued to the syndicate " they were all sold at from 105 to 109, and are steadily advancing in price." He further finds that the city has not ratified the contract.

Under these circumstances, for the city authorities to ratify the contract would be a gross fraud on the taxpayers. Under these circumstances why would not a bill lie by taxpayers to enjoin the city authorities from ratifying such an unconscionable contract procured by the constructive fraud of those to be benefited by it.

The bill filed in this case gave the city authorities notice of the fraud, and of the wrong done, and all that has been done

[Appeal of Whelen.]

is that they copied and filed as their answer the answer of the syndicate.

Without unduly lengthening this opinion the numerous exceptions filed to the Master's report cannot be answered in detail. It was neither practicable nor desirable for the Master to recite the evidence or to pass specifically on every question argued. He had but limited time to make his report after the case was argued before him, and it is likely some errors in detail were inadvertently made.

The fifth, seventh, eighth, ninth and tenth exceptions filed to the report of the Master, on part of the plaintiffs, are sustained. Except as they are sustained in whole or in part in the foregoing opinion and findings, all the other exceptions are overruled.

Let a decree be prepared by counsel for a perpetual injunction as prayed for in the first and fourth paragraphs of plaintiffs' prayer for relief.

WHITE, A. L. J., dissents.

### DECREE.

And now, to wit: October 25th, 1884, this cause came on to be heard, and thereupon, upon consideration thereof, it is ordered, adjudged and decreed as follows:

First. That the defendant, the treasurer of the city of Pittsburgh, be perpetually enjoined and restrained from receiving from the said defendants, Henry Whelen, Wilson McCandless and John D. Scully, or any or either of them, under the arrangement or arrangements in the bill in this case referred to and marked Exhibits "C," "E" and "F," thereto, any money for the redemption of the Street Bonds of said City of Pittsburgh in said bill mentioned and referred to; and that the defendants, the Mayor of the city of Pittsburgh and the Controller of said city, be and they are hereby perpetually enjoined and restrained from executing, and the said city of Pittsburgh from issuing, any Improvement Bonds in the name of said city running thirty years and bearing interest at the rate of five per centum per annum, free from taxation, and from delivering to said defendants, Henry Whelen, Wilson McCandless and John D. Scully, or any or either of them, or to any person or persons for them, or to be delivered to them, or any or either of them, any bonds of said city, under said arrangement or arrangements, either for cash or in exchange for any Street Bonds of said city now outstanding.

Second. That the said arrangements, dated respectively April 3d, 1880, March 23d, 1881, and May 14th, 1881, in the said bill mentioned and referred to, and attached thereto as Exhibits "C," "E" and "F," be and the same are hereby decreed void and of no effect.

Third. That said defendants, Henry Whelen, Wilson Mc-Candless and John D. Scully, pay the costs, including Master's fee, which is hereby fixed at fifteen hundred dollars.

PER CURIAM.

The defendants Whelen, McCandless and Scully took this appeal, assigning for error the above decree; the sustaining of the plaintiffs' exceptions to the Master's report, above given, and the not sustaining of the defendants' exceptions, above quoted.

The city of Pittsburgh took a separate appeal, and filed the following assignments of error:

First. The court erred in granting the preliminary injunction by the decree made on the 21st day of February, 1884, as shown by the record.

Second. The court erred in making the injunction perpetual, by decree made the 25th of October, 1884.

Third. The court erred in reversing the finding of the Master, to the effect that no actual fraud had been committed by the sub-finance committee of the councils of the city of Pittsburgh, and by Messrs. McCandless and Whelen, in the making of the contracts, dated respectively the 3d of April, 1880, the 23d of March, 1881, and the 14th of May, 1881, nor by the finance committee and councils of the city of Pittsburgh in approving the same.

Fourth. The court erred in finding and adjudging that said contracts were, in fact, fraudulent and therefore void.

The two appeals were argued together.

*W. C. Moreland* and *R. B. Carnahan*, for the city of Pittsburgh, appellant, submitted a printed brief.

*D. T. Watson* and *George Shiras, Jr.* (with them *Jacob F. Slagle* and *William S. Pier*) for the appellants Whelen, Mc-Candless and Scully.—Actual fraud was not charged in the bill, and the Master found that there was none. One of the judges of the court concurred with him. But, upon the opinion of the President Judge the Master's finding of fact on this subject was reversed, without as we claim, any plain mistake being pointed out. This is contrary to the well established rule, as to the conclusiveness of a Master's report: Harland's Account, 5 Rawle 323; Ludlam's Estate, 1 Harris, 188; Gosoner's Estate, 6 Whart. 403; Bicking's Appeal, 2 Brewster 230.

(Counsel went into an elaborate analysis of the testimony relating to all the pertinent facts in the case, and argued that the Master's finding that there was no actual fraud, was fully

warranted thereby, and that the inferences of actual ' fraud drawn by the court, as stated in the opinion, were unsupported by the evidence and the facts.)

Although the Master found that there was constructive fraud he also found that while such constructive fraud ren-dered the contract voidable at the election of the city, it was not void. The city, by its answer to the bill, if not by acts prior thereto, affirmed the contract, and equally with the other contracting parties, desire that it shall be carried out. The charge of constructive fraud is based upon the change of rela-tion of the syndicate, from the status of agents to that of purchasers. But what distinguishes this case from the author-ities relied upon by appellees is, that this change was at the suggestion of the principal, with full knowledge of all the circumstances of the case, and without either misrepresenta-tion or concealment by the agents.

As to the argument that the effect of the allowance of the commission of one per cent. was to make the sale at 99 per cent., it is a sufficient answer to say that the Act authorized the payment of a reasonable commission; that it was in the discretion of the city to whom it should be paid; that it is not pretended it was unreasonable; that no tax-payer was injured by its payment to the syndicate; and it is trivial to argue that if you pay it to A who sells the bonds to B it is all right, but if you pay it to A who buys the bonds himself it is all wrong. The Act authorized the sale at par of bonds at not exceeding six per cent. interest and a reasonable commission —they were sold at par at five per cent. interest. and a rea-sonable commission. While there is nothing in a name, and the syndicate are in effect the purchasers of the bonds, the result would have been just the same if Whelen and Mc-Candless had covenanted that the city should be able to place the bonds at five per cent. and the city had covenanted that it would allow Whelen and McCandless any profit that might be made by the sale of the bonds in the market over and above par and accrued interest.

The contract was not within the scope of a tax-payer's bill to rescind. In such case a tax-payer must show not mere irregularity, but absence of power by the corporation to make such a contract; and that unless restrained he will be injured in his property thereby. In addition to this a preponderating equity in favor of rescission must clearly appear to move the discretion of a chancellor: Dillon on Corporations, § 58; 1 Story's Eq. Jur. § —; Sparhawk *v.* Railway Co., 54 Pa. St. 401; Cooley on Taxation, p. 540–41; Wheeler *v.* Phila., 77 Pa. St. 346; Page *v.* Allen, 8 P. F. S. 344; Mott *v.* Pa. R. R. Co., 6 Cas. 9; Sharpless *v.* City of Phila., 9 Har. 158; Moers

*v.* City of Reading. 9 Har. 202; City of Pittsburg's Appeal, 79 Pa. St. 317; Pittsburgh *v.* Walter, 19 P. F. S. 367; Kilgore *v.* Magee, 4 Nor. 411. Looking at the whole case as of the date when the arrangement was entered into, the conclusion is a fair one, that the city had the power to make it; that no element of fraud, legal or actual, entered into it, and that it was a proper one to have been made under the circumstances. The effect of the decision of the court below is not only to prevent further issue of the bonds, to the great damage of the city, but to invalidate those already issued, exceeding a million and a half dollars, and which are in the hands of innocent purchasers for value, who are nevertheless affected with notice of want of lawful authority to issue them.

*George W. Guthrie* and *John Dalzell* (with them *Malcolm Hay, Kennedy & Doty,* and *A. M. Brown*), for the appellees.— The report of a Master is neither a decision nor an infallible guide, but an instrumentality to aid the court in performing its own functions: Phillips' Appeal, 18 P. F. S. 130. While the Supreme Court will rarely disturb the findings of fact of a Master, confirmed by the court below, that rule does not apply to deductions or inferences of fact from other facts found; in such case the Master's conclusion is 'simply a result of reasoning of which the court is as competent to judge as he: Phillips' Appeal, supra. The Master's qualified finding in this case that no actual fraud "has been proven," is merely his deduction or inference from facts found, and as that finding was not sustained by the court below, it has no weight in this court as a finding of fact. The facts from which he drew the inference of "constructive fraud," moreover, fully sustain a deduction of actual fraud. He reports: "We must find that the syndicate was guilty of that which would amount to a fraud in a party dealing at arm's length with the city, *or* that they actually knew that they occupied a situation which imposed on them higher duties, and knowing this, failed to perform those duties." He further finds that they occupied such a confidential relation to the city which imposed on them such higher duties; that "in the case in hand there was manifestly no severing of the relation of principal and agent existing between the city and the syndicate—the very contract recites this agency. There is no evidence anywhere of notice by them to the committee—'you must look out for us, it is now every man for himself.' The relation then existed on May 14th, 1881, in full force. . . . . . The Master is certainly not convinced that the syndicate advised the committee as they would have done as against a third party offering to purchase. To put the matter in a little different form, it does

not appear affirmatively that they put the committee in a position to deal with them with as little risk as, with their aid, they (the committee) could have dealt with third parties. And this seems to have been their duty." . . . . . "We are compelled to conclude that he (Mr. Whelen) misapprehended his real position, and regarded himself simply as a possible purchaser of these bonds, and as such bound to do nothing to enhance their value." And, nevertheless, the Master deduced the inference, from the above findings, that there was no fraud in fact! When, in addition to this, we look back from the point of view of the date of the final contract of May 14th, 1881, to the prior contracts and acts of Whelen & Co. as confidential agents—their depreciation to the committee of the state of the eastern market for such loans, their advising, and in their first contract as agents stipulating that the committee should procure additional legislation to make the bonds more desirable by extending the time of payment to the full term of thirty years, upon which the committee acted, and otherwise manipulated to the great disadvantage of the city in the event of an improved credit and money market, &c., &c.,— the whole scheme becomes apparent, and the only impartial inference is that the appellants knowingly and fraudulently took undue advantage of their influence arising out of their intimate confidential relation, to advance their own individual interests at the expense of the interests of their principal. But we contend that even upon the finding by the Master of " constructive fraud," this transaction was against public policy and void, and equity has jurisdiction in this proceeding to restrain the city from ratifying it, and compel it to annul the contract.

Apart from any question of fraud, the bonds proposed to be issued are not authorized by the Act of 1879 and its supplements, for the reasons, that councils could not delegate their discretion to the sub-finance committee; no ordinance regulates the amount or time of issue, the rate or adjustment of interest or the fund out of which payable; or the compensation for negotiating a sale. The issue violates the express terms of the Act in among others the following particulars: the bonds are virtually sold at one per cent. below par; they are made free of *all* taxation instead of merely city or county taxation; they are not exchangeable for Street or Temporary Loan Bonds by the holders of the latter; the interest is payable in Philadelphia and not exclusively at the City Treasurer's office in Pittsburgh. We further submit that the two supplements to the Act of 1879 are unconstitutional in that they purport to amend, and repeal in part, the original Act by reference merely, without reciting it in terms. On the whole

case we submit that the several " arrangements " between the syndicate and the sub-committee are (1) fraudulent in fact, (2) at least fraudulent in law; (3) ultra vires and void.

Chief Justice MERCUR delivered the opinion of the court October 5th, 1885.

This bill was filed by citizens and tax-payers of the city of Pittsburgh to enjoin against the performance of a contract, entered into between a sub-committee of the finance committee of the councils of said city of the one part, and the appellants of the other part, bearing date the 14th May, 1881. The former agreed thereby to sell to the latter certain bonds to be issued, to the amount of $6,000,000.

The learned judge enjoined the city against delivering the bonds to the appellants under the terms of said agreement. The validity of this decree depends on the proper construction of the Acts of Assembly authorizing the making and negotiating of the bonds.

A reference to the Acts, and a brief statement of some of the important facts, are necessary to a correct understanding of the case.

The Act of 9th May, 1879, authorizes, inter alia, the councils of any city of the second class, of which Pittsburgh is one, by ordinance to make, execute and negotiate its bonds, to an amount not exceeding six millions of dollars, the proceeds thereof to be used in paying or retiring bonds previously issued by the city for the purpose of improving the streets and avenues thereof, and also Temporary Loan Bonds issued to meet the interest on said Street Bonds, and for no other purpose whatever. The bonds to bear a rate of interest not exceeding six per centum per annum, and be payable thirty years from the date thereof, and be exempt from all taxation for city and county purposes, and be known as " Improvement Bonds." The third section of the Act declares " they shall be sold at not less than par with accrued interest ; but the said councils may allow a reasonable compensation for the sale or negotiation of the said bonds."

Supplementary Acts of the 11th of March, 1881, and 15th April, 1881, respectively, were passed. As however they do not profess to change those portions of the Act of 1879, which in our opinion control the decision in this case, we refrain from passing on their validity.

On the 12th January, 1880, the city of Pittsburgh passed an ordinance authorizing an issue of bonds, substantially in the words of the Act of 1879, and declared they should not be sold at less than par and accrued interest; but provided that the finance committee, or sub-committee thereof, might

allow a reasonable compensation for the negotiation, sale or exchange thereof.

On the 3d of April following the sub-committee entered into an arrangement with the appellants, Whelen and McCandless, whereby, in consideration of services to be performed by the latter in the negotiation, sale or exchange of said loan, in the funding of the street and temporary loan indebtedness of said city, they were to be allowed, first, for the sale or exchange of new six per cent. thirty years loan free from taxation, a commission of one per cent.; second, for the sale or exchange of new five per cent. thirty years loan free free from taxation, an additional compensation of one per cent. It was, however, agreed that the six per cent. loan should not be placed unless it was found impracticable to place a new five per cent. loan within ninety days of the maturity of the bonds to be funded, and in that event due notice in writing should be given to the sub-committee; and in case the appellants failed to provide for the payment of the maturing loans by the sale or exchange of said improvement loan, as therein provided for, the contract should cease and determine.

This contract having failed to effect the desired object, a second agreement was entered into between the same parties, on the 23d day of March, 1881. After reciting the Act of 11th of March, 1881, and the city ordinance passed to give effect thereto, both of which had been procured in pursuance of agreement between the parties, it proceeded to declare that the new five per cent. bonds should be made payable in thirty years, and be issued to the appellants in exchange for "all Temporary Loan Bonds" presented by them, at par and accrued interest; and it was therein further stipulated that all bonds purchased by the appellants under the provisions of the original and this supplementary contract should be furnished to them at par and accrued interest. This contract like the former one failed to effect its intended purpose. Then a third and final one was entered into on the 14th May, 1881. It refers to and recites the previous legislation, and the previous contracts between the parties, and ratifies the latter subject to the modifications contained in said agreement of the 14th May. It then declares the city of Pittsburgh "sells at par and accrued interest" to the appellants "$6,000,000 of its Improvement Loan Bonds, authorized by Act of 9th May, 1879, and its several supplements and ordinances of councils." It further provides that the appellants "shall be allowed a commission of one per centum upon all bonds purchased or exchanged by them under the provisions of this agreement, the said commission to be allowed in adjustment of accrued

interest or paid by the city warrant, if such accrued interest should not be sufficient to meet the said commission."

It has thus been shown that the original Act, which authorized the issue and negotiation of the bonds, expressly stipulated that they should be sold for not less than par with accrued interest, permitting only a reasonable compensation to be paid for the sale or negotiation thereof. That restriction was not removed by any supplementary legislation. The first agreement does not contemplate any sale of the bonds to the appellants, but merely their employment as agents to sell the same for the benefit of the city. The next agreement does not affirm a present sale, but assumes the right of the appellants to purchase the bonds; and in case they do, then the bonds are to be furnished to them at par and accrued interest. The last agreement stipulates and declares " the city of Pittsburgh sells at par and accrued interest " to the appellants the whole six millions of dollars of bonds which it was authorized to issue, and allows them a commission of one per cent. on all bonds purchased or exchanged by them under the agreement.

The main question arises under this last agreement. Is it practically and substantially an agreement to sell the bonds to the appellants for less than par and accrued interest? If so, the sale is not authorized by the statute, and the contract therefor may be avoided.

In Dillon on Municipal Corporations, § 89, it is declared to be an unquestioned rule of law that a municipal corporation does not possess and cannot exercise any other powers than these, to wit: first, those granted in express words; second, those necessarily or fairly implied in, or incident to, the powers expressly granted; third, those essential to the declared objects and purposes of the corporation—not simply convenient but indispensable. Any fair, reasonable doubt as to the existence of power is resolved by the courts against its existence in the corporation, and therefore denied.

It is equally well settled that the agents, officers, or city council of a municipality, cannot bind the corporation by any contract not within the scope of its powers. Id. § 457.

The rule is said to grow out of the nature of such institutions, and to rest on just and solid grounds. The inhabitants are the corporators. The officers are only the public agents of the corporation. Their powers and their duties are prescribed by the charter or by statute. All persons dealing with them are bound to know the extent of those powers. Any rule or practice which permits municipal officers to transcend their powers is clearly contrary to public policy, and fraught with such mischievous and injurious effect to the tax-

payers of the municipality, that it should receive judicial condemnation.

It is not claimed that the power to issue and sell these bonds is given by the charter of the city, or that it is incident to, or necessarily flows from, any power therein contained. On the contrary it is conceded that the power claimed arises solely under the statutes cited.

What then is the true character of the final contract? A clear distinction exists between an agency to sell bonds for the city and a contract to buy them of the city. The former is a transaction which is to give the city the full benefit of the sum for which they may be sold, less the reasonable compensation agreed to be paid for effecting the sale. The latter wholly deprives the city of any of the excess above par for which the appellants may sell them, however large it may be. In the one case the appellants are bound to act in good faith, and to endeavor to obtain for the city the highest market value for its bonds. In the other the bonds are to become the property of the appellants, so they may dispose of them as they see proper and enjoy the proceeds thereof. The relation between agent and principal is so essentially different from that which exists between vendee and vendor, that it is useless to further elaborate the distinction.

Was not this transaction undoubtedly a sale? The parties to the contract called it a sale. It had all the incidents of one. The price to be paid by the appellants was definitely fixed. The city was not to derive any profit from a sale by the appellants at a higher price, nor to suffer any loss in case of a sale by them at a lower price. The appellants alone would enjoy the profits of their sale, and suffer the loss, if any. In fact, however, it is shown that at the date of this contract the bonds were worth more than par, yet practically the city was to receive only ninety-nine per cent. of their par value.

The credit of the city of Pittsburgh was bad during several years prior to 1879. It had once disputed the validity of its bonds to the amount of over five millions of dollars; but they had been adjudged to be valid.

The general business prosperity of the country had increased and the credit of the city had improved, yet the actual market value of the bonds does not appear to have been known to the officers of the city in the spring of 1881.

The bill does not charge any intentional fraud, nor pray that the contract be set aside on that ground. The Master finds as a fact, and we think correctly, that no actual fraud has been proved on the part of any one in the procurement or execution of the contract 14th May, 1881. Previous contracts

having failed to enable the city to realize on the bonds, it very naturally was induced to enter into some other arrangement to provide for its maturing indebtedness, on some of which it had paid seven per cent. The method, however, which was adopted, overlooked the restricted authority of the city to negotiate these bonds, under the statute. It cannot correctly be said that this transaction in effect is the same as if the appellants had been authorized to sell the bonds at par, and were to be paid a commission of one per cent. for making the sale. In such case they would have been entitled to the one per cent. only. Under this contract of sale, as the evidence discloses, they may realize a profit of five per cent. If they had acted as agents the larger portion of this would enure to the benefit of the city.

. It is urged to now enjoin against a further execution of the contract will destroy the validity of the bonds already delivered, amounting to over one and a half million of dollars, and which are in the hands of third persons. This argument overlooks the fact that the city was authorized to make, issue and sell the bonds. The authority to sell was a separate and distinct power. The restriction imposed on the sale related only to the price at which the city should sell them. Having in consideration of nearly their value actually sold and delivered them, and having thereby caused them to pass into the hands of good faith purchasers, the rights of the latter cannot be affected by a decree enjoining against any further delivery of bonds under the contract, and a cancellation of the unexecuted portion thereof.

Many questions were argued which we deem unnecessary to discuss further than they are answered by what we have already said, as they do not change the conclusion at which we have arrived.

We are not willing to adopt all the reasons assigned by the learned judge to sustain his decree, nor the decree itself to its full extent. We must therefore reverse portions thereof, in order to modify its terms in accordance with this opinion.

. And now, October 5th, 1885, it is ordered that the appeal be dismissed at the costs of the appellants, and that the third paragraph of the decree relating to the payment of costs by the appellants be affirmed, that the residue of the decree be reversed, and in lieu thereof it is further ordered, adjudged and decreed that the treasurer of the city of Pittsburgh be perpetually enjoined and restrained from receiving from the said Henry Whelen, Wilson McCandless and John D. Scully, or any or either of them, under the arrangement or arrangements dated respectively April 3d, 1880, March 23d, 1881, and May 14th, 1881, any money for the redemption of the

Street Bonds of said city, in said bill mentioned; and that the mayor of the city of Pittsburgh, the controller of said city, and the city of Pittsburgh, jointly and severally, be perpetually enjoined and restrained from delivering to said Henry Whelen, Wilson McCandless and John T. Scully, or any or either of them, or to any person or persons for them, or to be delivered to them or any or either of them, any bonds of said city under said arrangement or arrangements, either for cash or in exchange for any Street Bonds of said city; and that said arrangements be hereby annulled, avoided and cancelled.

Mr. Justice GORDON delivered the following concurring opinion, October 5th, 1885:

I concur in the opinion of the majority of this court as delivered by the Chief Justice; and I also agree with the court below that the contract of May 14th, 1881, if of any value whatever, must be taken as an absolute sale of the bonds of the city of Pittsburgh to Henry Whelen and Wilson McCandless. "The city of Pittsburgh sells at par and accrued interest, to Henry Whelen of the city of Philadelphia, and Wilson McCandless of the city of Pittsburgh, $6,000,000 of the Improvement Loan Bonds, authorized by the Act of the 9th of May, A. D. 1879, and its several supplements." Then follow the conditions of payment and delivery, and it concludes with its execution by the signatures and seals of the sub-committee of finance, and Whelen and McCandless. If this is not a contract of sale I must confess my ignorance of the form and purport of such an instrument, and it does seem to me that the contrary assumption ignores both the common and technical meaning of the words which the parties have made use of. "The city of Pittsburgh sells at par and accrued interest, to Henry Whelen and Wilson McCandless, $6,000,000 of the Improvement Loan Bonds." There is no such thing as an avoidance or misinterpretation of this language; it is a plain, straightforward sale of these bonds at par, as required by the Act quoted. Indeed, nothing else is pretended; the counsel for the appellants says: "the syndicate are, in effect, purchasers of the bonds."

By what authority, then, does it come about that Whelen and McCandless, by a subsequent clause of this same contract, are to be allowed a commission of one per centum on all bonds purchased or exchanged by them? A commission for buying these securities? It can hardly be argued that as agents for the city they sold to themselves. Such a transaction would be a legal curiosity, and worthy of careful scrutiny, but the fact is, that they were purchasers directly from the city, and so the contract of sale reads. It follows that this pretended

commission means nothing more or less than an abatement of one per centum from the price to be paid for the bonds; in other words, these purchasers were to have them at one cent less on the dollar than par. The result is, that the city authorities were acting *ultra vires* when they made this contract.

The Master, however, argues that if these parties acted in good faith under the previous arrangements, that is, those of the 23d of April, 1880, and 23d March, 1881, and bought the bonds themselves at as high a price as could be obtained from any other party, the allowance of a commission did not violate either the spirit or letter of the statutory prohibition. There is here, however, an assumption that the facts do not support. These parties cannot stand on the hypothesis that in the final contract they were acting as agents for the city, not only because of the patent inconsistency of making a sale to themselves, but because this contract so modifies the previous arrangements as to annul the agency for the disposition of the bonds, and substitute the agreement for an absolute sale. Moreover, whether the appellants bought the bonds for a price as high as others would have given, is a matter unknown, for no opportunity was given for competition after the supplementary Acts of March 11th, and April 15th, 1881. Thus the Master's conclusion respecting the commissions fails for the want of the facts necessary for its support, and there is only left the anomaly of a bonus given to Whelen and McCandless, not as sellers, but as purchasers, of the city bonds. The fact that these securities have, in violation of the express terms of the Act of Assembly, been sold at less than their par value, cannot be concealed or its effect destroyed by so flimsy a theory as that volunteered by the Master. Worse still, if his hypothesis be correct; if these men were indeed still acting, under the previous arrangements, as the agents of the city in the execution of the contract of the 14th of May, then, according to the Master's own finding, was the whole transaction in which they were engaged, so tainted with fraud (he calls it legal fraud), that the city was not bound by it.

In his own language: "That the city has not ratified said contract of May 14th, 1881. He is, therefore, of the opinion that the city of Pittsburgh has the right to disaffirm said contract of May 14th, 1881." We cannot exactly understand how the city can disaffirm a contract it never made; but no matter, for the effect of the finding is not only to avoid the contract, but also what might be regarded as its ratification by the city councils in their action, on the report of the financial committee, of December 11th, 1882. In this I agree with the Master; that is, on the hypothesis that he is correct in assuming that Whelen and McCandless were, at the time of

making the contract under consideration, acting as agents of the city, and as such were to receive commissions for the sale of the bonds to themselves. Such a contract with a trustee, acting for himself as well as for his principal, would be constructively fraudulent, and, without regard to the bona fides of the transaction, voidable by the principal.

If, however, as the report abundantly shows, there was fraud in fact, either by false assertion, or by the suppression or concealment of that which these agents, if such they were, knew to be proper for the officers of the city to know, the contract would for that reason be void, and not susceptible of ratification if it involved a loss to the city. Indeed, such ratification on part of the city officials would in itself be a fraud, and therefore open to the investigation of the citizen. With the principle here stated the learned Master was doubtless acquainted, hence, he designates the actual fraud which he has discovered and pointed out, as legal fraud, thus making the contract susceptible of ratification by the councils, and so turns the plaintiffs out of court. The error involved in this conclusion is obvious, and needs no discussion.

If, on the other hand, the appellants are to be regarded as mere purchasers, as they seem to have regarded themselves, and if at the time of the making of the 14th of May contract they were released from their previous obligation as city agents, they were bound by no legal tie which prevented them from making the best bargain possible with the municipality. In such case, their experience and knowledge were their own, and they were not obliged to impart it to the committee with which they were dealing. In either case, however, the contract comes to nothing; in the one because it is void for fraud; in the other because prohibited by the Act of 1879, hence its execution on part of the city was unlawful.

But, returning to the position assumed by the Master, and treating these men as the confidential agents of the city, it is impossible for me to comprehend how this transaction can have one moment's favorable consideration in a court professing to be governed by the rules of equity. I have no hesitation in assenting to what his Honor, Judge EWING, finds to be a fact; that is, that there was actual fraud in the procurement and making of the contract, and that with the peculiar moral ideas of the defendants we have nothing to do. They may have thought it a good thing to first gain the position of a financial confidant of the municipality, and when in that position make a bargain with it as though they were dealing at arms' length. But, with the honorable judge below, I am not of that opinion. To sustain the court in this finding we need go no farther than the Master's report, and even in it we

might confine ourselves to the citation of the testimony of Mr. Whelen. This gentleman when asked whether his firm had not been dealing in Pittsburgh bonds prior to the execution of the contract of May 14th, 1881, answered: "I think not; it would not have been a wise thing on our part?" and on being further interrogated why he did not consider it a wise thing for his firm to do, said: "why, after I became the owner of a lot of bonds of course it would be my interest to put the price of the bonds up, if I could, and not before, and that is true of all marketable securities." Under this piece of evidence, the Master, whilst giving Mr. Whelen credit for acting up to what he believed to be the whole measure of his duty to the city, concludes that he misapprended his real position, and regarded himself only as a possible purchaser of the bonds. I agree that there is here somehow a misapprehension; Mr. Whelen certainly did misapprehend both his position and duty, or the Master misapprehended Mr. Whelen and his associates. If it be true that these bankers, whilst acting as agents for the city, were thus quietly endeavoring, if but negatively, to prevent an appreciation of Pittsburgh securities, and in this manner to keep down the city's credit until they could secure to themselves the control of the forthcoming bonds, the moral vision of that man, or court, that cannot see a gross fraud in such a transaction, must not only be obscured but totally perverted.

The same implication may, in like manner, be drawn from the fact that not a word was said to the committee of the sale by Whelen in November, 1880, of five per cent. Pittsburgh bonds at $1.05; the quotation by his own house, in July of the same year, of the same bonds, at a premium; of the sale of compromise bonds at $1.07 and $1.08, and of the premium on the five per cent. building bonds of 1880. So, syndicate and committee alike seem to have overlooked the prompt and eager bidding of the city banks and business men for the $1,400,000 Temporary Loan of March 1879. Furthermore, in the face of this exhibit of the sound financial standing of Pittsburgh; regardless of its assured commercial prosperity, its credit was impeached. This credit had been at one time doubtful, therefore, and notwithstanding all the evidence to the contrary, it was alleged still to be doubtful. Great care seems to have been taken to impress this upon the committee; a committee, who having tried the experiment, soon discovered that however it might be as to their skill in the several businesses in which they were engaged and understood, they were no match for these astute bankers in the matter of finance. As the Master informs us, the mere shrug of Whelen's shoulders was a matter of awe and terror to those

unskilled committeemen. Now, all this was well enough as long as these appellants were understood to be acting as agents of the city in the sale of her bonds, for in that case they could make nothing by the depreciation of these securities since they could only have their commissions, and all that they said and did might be regarded as merely an effort to enhance the value of their services in the eyes of the committee. So, it would have been all well enough had they from the first occupied the position of mere purchasers or bidders, for then their knowledge would have been their own, and the city could not justly have complained that they withheld it; in that case they would have dealt with her at arms' length, and if by their skill and silence they got the better of the bargain, they would have been of good standing at least in the forum of legal ethics. But if we are to take it that all this negotiation for special legislation, all this *suppressio veri*, this carefulness to do nothing that would tend to appreciate the credit of Pittsburgh, had for its object the contract of May 14th, 1881, by which they, acting as the agents of the city, procured a sale of the bonds to themselves, and at the same time retained their commissions; when by these means they seek to draw from the municipal treasury some half million dollars which as much belong to the city as any other part of the proceeds of the bonds, the matter presents a very different appearance. It cannot be sleeked over under the name of 'legal fraud' and so passed off as something that has done the citizen no harm; as a matter with which he has nothing to do, and as though if only the treasury were thus depleted in a genteel manner, and by respectable men he ought to be satisfied. How coolly this man, whom the Master presents to us as a paid city agent, tells us that his house took care not to have anything to do with these bonds till after the contract of the 14th of May; "It would not have been a wise thing"; it would have been working in the interest of his principal, and that was not a wise thing to do. But "after I became the owner of a lot of bonds it would be to my interest to put up the price of those bonds, if I could, and not before." And this agent, this attorney in fact of the city, who steadily keeps in view his own interest to the exclusion of that of his principal; who carefully prepares the way for the 14th of May contract, through and by which he and his associates are to get at par city bonds representing $6,000,000, which even then commanded a premium of five per centum, and which he and they knew would, in their hands, still further appreciate; this municipal agent and his associates, who, if the Master's position be correct, deserve anything rather than compensa-

tion, are to have for their services in thus helping themselves, in addition to their enormous speculation, the modest sum of sixty thousand dollars ! !

Now, while I think the conclusions above stated are fairly deducible from the position assumed by the Master; that is, that the appellants occupied the double position of purchasers and agents, yet with the majority of this court, I am unwilling to adopt a position which would put the appellants in a light so unenviable. The character of the men engaged in this transaction would seem to negative so harsh an assumption, and we, therefore, the rather adopt the conclusion of the court below, that the agreement of the 14th of May abrogated the previously existing agency, and put the appellants in the position of purchasers of the bonds at a discount of one per centum.

I also agree, that though the contract of the city with the appellants was without warrant of law, that this fact in no wise affects innocent holders of the bonds to whom they have been passed by the defendants. The position of such holders has been so fully discussed in the recent case of Kerr v. The City of Corry, (9 Out. 282), that further time spent upon the question would be to no purpose.

TRUNKEY and STERRETT, JJ., concur in the decree, for reasons expressed in the opinions of the Chief Justice and Justice GORDON.

Mr. Justice PAXSON delivered the following dissenting opinion October 5th, 1885, in which Justices GREEN and CLARK concurred.

The complainants below are citizens and taxpayers of the city of Pittsburgh, and they filed this bill to prevent the corporate authorities of said city from further proceeding in the execution of a contract by which the appellants had agreed with the said city to place some six millions of its five per cent. bonds at par. The complainants allege, 1st, that the contract was tainted with fraud, and 2d, that it was *ultra vires;* and upon these grounds they ask what practically amounts to its rescission.

As this is asked of a court of equity, a court whose decree is of grace, not of right, and whose conscience must be moved before it will act, it is proper to pause just here before I enter upon a discussion of the case, and consider intelligently what we are asked to do. This is the more necessary from the fact that the case involves large public as well as private interests, and has excited considerable feeling in the locality to be affected by it. The oral arguments to which we have listened, and

the printed arguments which we have read, plainly reflect this state of things. It is therefore the more necessary to bring to the consideration of the case that calmness which should always mark judicial action.

It is an undisputed fact that the contract has been executed to the extent of $1,500,000; that is to say, bonds to that amount have been delivered by the city authorities to the appellants, who paid for them at par, and who have resold them to innocent parties. We have then an application on the part of persons who were not parties to the contract to strike it down after its execution to this large extent, upon the ground that it was fraudulently made, and was moreover an excess of authority on the part of the city officials. If either ground were well taken, it would be the duty of the court to grant the prayer of the bill. But it must be apparent to the dullest comprehension that such action, involving consequences of so serious a nature, ought not to be had excepting after the most mature and careful consideration, and upon the clearest proof.

· The first question to consider is the charge of fraud. Upon this point the Master has found that there was no actual fraud on the part either of the city authorities or the appellants in the making of the contract, but he finds there was constructive fraud, in this, that the appellants, Whelen and McCandless, occupied a confidential relation to the city; that they did not disclose to the officers of the said city, as they ought to have done, all the facts and circumstances pertaining to the question of the value of the said bonds, and necessary in order to determine the advisability of the making of said contract of May 14th, 1881, by the city as they (the members of said syndicate) possessed them; and that said syndicate have not shown that they gave to said officers of the city the benefit of their skill and judgment as financiers upon the question as to whether or not it was to the interest of the city of Pittsburgh to execute said agreement. ·

The learned judge of the court below goes further than the Master, and finds both actual and constructive fraud. He says in his opinion: "In our opinion the evidence shows, and we find as a fact, that there was actual fraud in the procurement and making of the contract."

Actual fraud is a question of fact, and like every other question of fact must be determined upon the evidence. And it should only be found upon satisfactory evidence. When it is brought against a number of men who have long maintained a high character for integrity, it should never be assumed, nor should it be inferred from weak and inconclusive facts. It is

a charge which should never be lightly made, affecting as it does the business, moral and social standing of the parties.

It is a significant circumstance that throughout this vast mass of testimony there is no proof that any one concerned in this transaction, whether as banker, member of councils, city officer or private citizen, was guilty of corruption. The profits of the contract belonged exclusively to the bankers who agreed to negotiate the loan. The evidence shows that not a dollar ever found its way, directly or indirectly, into the pockets of any city official, nor was there any agreement or understanding looking to such an event in the future.

In what then did the fraud consist? It was alleged that the contract was improvident on the part of the city; that the bonds were at that time worth more than par; that they have constantly appreciated in price, and are now selling at 110; that it was unnecessary to contract in advance for the placing of $6,000,000 of bonds, when many of the Street Bonds which they were intended to replace did not mature for two, three or more years. There were some other trifling matters thrown in as make-weights, but the real ground of the charge of fraud consists in the allegation that the contract was so manifestly adverse to the interests of the city at the time it was made, as in itself to constitute evidence of fraud.

It is necessary here to move with caution. It will not do to attach undue weight to the fact that the bonds have largely increased in value, for two reasons, viz.: 1st, that such advance may be due to some extent to the contract itself, and 2d, that had the price of bonds declined instead of advancing, we would have heard no allegation of fraud; there would have been no bill filed to restrain the city from issuing the bonds, but, on the contrary, the strong probability is that the complainants and the municipality would have united in holding the appellants to their contract.

The present value of the bonds has little significance in the consideration of the question of fraud. Their value at the time the contract was entered into may have more importance. Was the contract so improvident; so adverse to the interests of the city, as to furnish reasonable grounds to believe that it was betrayed by those having charge of its affairs, or that the city authorities were fraudulently misled by the bankers who were contracting with them? It is plain that a mere error of judgment on the part of the city would not stamp the transaction as fraudulent. While, therefore, the wisdom of the contract is not an important element in determining its character, it is nevertheless necessary to refer briefly to the circumstances under which it was made. If made in good faith neither party can repudiate it merely because it was unwise.

The law was so declared in City of Williamsport *v.* Commonwealth ex rel. Bair & Shenk, 3 Norris 487.

About the year 1877 the city of Pittsburgh defaulted in the payment of interest in a series of bonds amounting to over $5,000,000, commonly known as the Penn Avenue Bonds. In Commonwealth ex rel. Whelen *v.* Select and Common Councils of the City of Pittsburgh, 7 Norris 66, we decided that these bonds were the bonds of the city of Pittsburgh and a part of its funded debt; and ordered a peremptory mandamus to issue to the councils of said city, commanding them to make provision for the payment of the interest. The interest which had accumulated at that time, together with interest for the current year, amounted to about $1,400,000, and the city had not the cash means on hand to pay this large sum. This was in the latter part of 1878. In January, 1879, two gentlemen selected by the finance committee of city councils, visited Philadelphia and New York for the purpose of procuring a loan of money to enable the city to pay this interest. They were unable to obtain the loan at either place, at any rate of interest, and returned and so reported. Subsequently an effort was made to place this loan in Pittsburgh, and after much exertion the movement became a success and the money was secured. The loan was for five years, and the rate of interest was six per cent. It further appears that each subscriber was to be allowed a commission of one per cent., or what would be the equivalent of it. It also appears that eventually more money was offered than was required, and the subscriptions were scaled down. We have no doubt that the taking of this loan by the citizens of Pittsburgh went very far towards re-establishing the credit of the city. That it did so fully, would perhaps be saying too much. Credit is a thing of slow growth, and when once impaired, from whatever cause, can seldom be fully restored by a single transaction, and the city of Pittsburgh could not reasonably expect, even after this show of confidence on the part of her own capitalists, to place a loan on as favorable terms as a city which had never defaulted on its bonds, nor litigated with the holders thereof.

At that time the total amount of property in the city subject to taxation was $95,556,668. The Penn Avenue Bonds amounted to $5,273,700; add to this the interest which had just been funded in new bonds, and we have $6,673,700 of debt growing out of the street improvements. The other debt of the city then outstanding amounted to $8,152,405.11, making altogether an indebtedness of $14,826,105.11. It will thus be seen that the city was in debt to an amount far exceeding the limit prescribed by the constitution. As the debt was

all contracted before the constitution was adopted by the peo-
ple, no constitutional question arises, and it is only important
as bearing upon the credit of the city.

This was the situation in 1879. The Street Bond debt
matured at various times from 1883 to 1885. It therefore;
became a matter of concern to the city authorities to provide
for the maturing of these bonds. All of them excepting those,
given to fund the interest bore interest at seven per cent. It
is a conceded fact that city councils regarded some action to,
be essential to meet this emergency. Accordingly we learn
that several Acts of Assembly were procured to be passed by
councils, and a number of ordinances were passed by them
for the purpose of enabling the authorities of the city to re-
place these bonds as they matured by bonds bearing a lower
rate of interest. We need not go over this legislation and
the ordinances of councils in detail. It would extend this
opinion to an unreasonable length. It is sufficient to say that
for anything that appears, it was all done openly, was known
to and discussed by the citizens, and through the papers, and;
is free from any imputation of fraud.

The sub-finance committee of councils acting under direct
authority of a city ordinance, held a number of interviews,
with the appellants, and with some of the leading business
men and financiers of Pittsburgh, the particulars whereof I
have not the time, nor is it necessary to specify. It is suffi-
cient to say that it finally resulted in the contract of May 14th,:
1881, between the sub-committee and Henry Whelen and
Wilson McCandless, two of the appellants, by which the
appellants agreed to take $6,000,000 of the bonds at par and
accrued interest, and were to be allowed a commission of one
per cent. This contract was subsequently reported to the
finance committee, and by them unanimously approved. Af-
terwards the finance committee reported the same to councils,.
and the report was there read. It does not appear that any·
action was taken upon it by councils; the Master reports that
it was never formally approved. There was evidently an..
opinion prevailing among some at least of the committee that;
no action was necessary on the part of councils. We are not;
required to pass upon this question, as the city is not here-
denying the validity of the contract nor of the bonds issued:
under it; nor is she repudiating the action of her finance com-;
mittee. On the contrary, she is an appellant in this case; has
filed an answer expressly disclaiming any participation in this
blow at her credit, and asking that this decree may be reversed.·
Nor is the course of the city open to criticism on this account.:
She has received about $1,500,000 of the appellant's money,·
which she has applied to the extinguishment of that much of:

her public debt. To now repudiate the contract under which this was done, would have been a blow at her financial standing far more serious in its consequences than could be compensated by any doubtful gain she could possibly receive by assisting in striking down this contract.

Was the contract made in good faith? Upon this point the evidence is overwhelmingly in favor of the appellants. W. R. Ford, one of the members of the finance committee who signed the contract, testifies:

Q. So far as you came in contact with financiers, so far as you were conversant with the financial outlook at that time, did you or did you not believe that it was a favorable time for the securing of a low rate of interest for the city of Pittsburgh?

A. I did, sir, because at that time I thought money was ruling pretty low, and we could not tell what the circumstances of trade might hereafter be, which might make a better demand for money, and my idea was that if we could secure the contract at a low rate of interest, as I took it, a fair rate of interest, as I thought 5 per cent. was, it would be better for us than to take the risk of what might occur at the time of the presentation of the bonds for payment.

A. F. Keating, a member of the sub-committee, and also a party to the contract, testifies as follows:

Q. Give the Master the reasons which led you to believe it (the contract) to be expedient and advantageous.

A. That is a pretty long tale to tell. Well, I was pretty conversant with the management of the city's finances at that time, and had spent a great deal of time in framing the Penn Avenue compromise. I necessarily had to have a good deal of knowledge with regard to the matter in which the city's debt, its interest and appropriation and the expenditures that had been made; and I also knew the fact that when the city was in distress, requiring money to pay its interest that it had defaulted on, that the citizens of Pittsburgh had subscribed $1,405,000 for that purpose, but I was also aware of the fact that they made these bonds five year bonds, and that they matured just previous to a large amount of Street Bonds which they were to pay the interest on, and I concluded from that that there was not very much hope for a permanent loan for any great amount, for any great length, to be taken by her own citizens. I knew that the reputation of the city had gone before it in every financial centre, and that she had defaulted on her railroad debts, and had defaulted on the interest of the Street Bonds; that she was very greatly in debt, and that our people had previously decried the credit of the city. That we never had introduced an appropriation ordinance without its

being looked upon as exceedingly harsh in its rate of taxa-
tion, and I knew that the credit of Allegheny county had
always been above ours ; that she had placed a loan in Feb-
ruary or March of 1880 at 5 per cent., sold $1,123,000 of it
at par, and subsequently sold a smaller amount, $400,000, at
a premium.  Knowing that her bonds had always sold higher,
I thought if we could get, I believed if we could get, a con-
tract that would give us the same rate of interest for a sum
of money that was more than the county debt entire, we would
be doing a very good thing.

R. B. Carnahan, Esq., a member of councils and of the
finance committee, also testified that in December, 1881, the
Monongahela Navigation Company had decided to issue a new
loan for $500,000, and that the directors after consultation had
fixed the rate of interest at five per cent. as the best terms
they could get.  That this circumstance had some weight with
the witness, as he regarded that corporation as good as any in
the state of Pennsylvania.  The witness also referred to some
School Bonds in his School District which they were not able
to get below five per cent. in 1881, and to the five per cent.
bonds issued by Allegheny county in payment of riot losses,
which were issued in 1880 at par; subsequently they com-
manded a small premium.  The witness then continued :
" There were other matters, too, if you want me to give the
whole subject; I considered the credit of the county was
good and the credit of the city was bad.  There was no inter-
est appropriated and no money for interest, I think, in 1877
and 1878.  In 1879 a mandamus was issued by one of the
judges of the Court of Common Pleas No. 1 ; he had rendered
a long opinion which went abroad against the validity of the
bonds ; I remember reading it in the New York newspapers ;
we were in the position of repudiators, forced to pay under an
order of court, and under the opinion of one of our local
judges that the bonds were not good ; these things were
against the credit of the city ; and I was informed that you,
sir, had gone East to negotiate a loan, and found the doors of
the bankers closed, and they would not talk to you."

It further appeared that on April 1st, 1880, $141,000 Tem-
porary Loan Street Bonds fell due.  On the 19th of March
preceding the sub-finance committee had advertised in the
official papers of the city of Pittsburgh for a loan of that
amount to redeem these bonds.  The advertisement invited
bids at par for bonds at four, four and a half and five per
cent., to be accompanied with a certified check for ten per
cent. of each bid, and the right was reserved to reject any and
all bids.  Not a single bid was received for either class of
bonds.  This advertisement has been the subject of much

criticism, and the court below evidently regarded it as a link in the chain of fraud. The learned judge said : " If it were intended to make a show of inviting proposals where none were desired, it would be intelligible. Of course no bids were received." It would have been more satisfactory if the grounds of his objection had been stated. We see nothing upon the face of it to indicate fraud or bad faith. The notice was short, it is true, but the learned judge omits to state, what the evidence clearly shows, that this was no fault of the committee, and it is not alleged that the appellants had anything to do with this advertisement. The truth is the finance committee had inserted the $141,000 in the appropriation ordinance for that year, but one branch of councils struck it out, and in its amended form the ordinance only passed about two weeks before the advertisement appeared, and as the Street Bonds matured on the first of April, all the notice appears to have been given that was practicable. The proposal for the three kinds of bonds was proper, and while the stipulation for ten per cent. in cash was perhaps unnecessary, it was not unusual in such transactions, and would not be likely to deter bidders. The fact remains that not a bid was offered.

There was also a large amount of testimony given by respectable and prominent gentlemen of Pittsburgh—bankers, merchants and manufacturers—to the effect that under the circumstances they regarded the contract at the time it was made as wise and judicious, and to the advantage of the city. There was also testimony of an opposite character ; that it was unwise, and that in the opinion of the witnesses the bonds could have been placed at a better rate. They were but opinions, however, and do not touch the question of good faith. It may be, looking at the transaction from the standpoint of 1884, we might conclude that the bonds could have been placed to better advantage, but even this is by no means certain. The occasional sale of a small lot of bonds in 1880 and 1881 at a premium would not of itself furnish any safe guide to assume that the large quantity of $6,000,000 could be disposed of in excess of par, and it furnishes no justification for branding as rogues all concerned in the transaction. I am clear that there is not a scintilla of proof within the four corners of this record to show that any actual fraud was committed by any one.

Thus far we agree with the Master, but we do not assent to his finding of constructive fraud. This charge, as before observed, rests upon the existence of an alleged confidential relation between Messrs. Whelen and McCandless and the sub-committee, and the neglect on the part of the former to give the committee full information as to the value of the bonds.

Granted the confidential relation, what fact did they suppress or withhold from the committee which they ought to have communicated? The finding of the Master, already quoted, upon this point is flatly contradicted by the evidence. When Mr. Whelen was on the stand he was asked this question: "Mr. Whelen, I wish you would state whether, at the time or before the making of these contracts, from time to time you furnished the city authorities that you met with all the information possessed by you bearing upon the question of placing these securities properly, their value," &c.; to which question the witness replied: "I did as fully and frankly as it was in my power to do." It also appears that Mr. Whelen and Mr. McCandless furnished some of the members of the finance committee with accounts of the sales or quotations of bonds, Pittsburgh and others, in different financial centres, and there is not a word of testimony that any such information was withheld. Some importance was attached to the fact that in November, 1880, Mr. Whelen had sold to the Dollar Savings Bank of Pittsburgh a small amount of what are known as Pittsburgh Railroad Compromise five per cent. bonds at 105. Mr. Ford knew of this transaction, however, and it is of slight importance from the fact that the bonds in question appear to have been of a higher market value; they were issued by the city in compromise of a long litigation, and the holders thereof had no reason to anticipate further difficulty in regard to them.

That the committee sought information and were not denied it, is manifest from the following extract from Mr. Ford's testimony:

Q. Did you discuss, Mr. Ford, from time to time with Messrs. Whelen and McCandless, or either of them, the price and value of Pittsburgh securities between the making of the first contract and the third contract?

A. Yes, sir.

Q. Did they give you the information that you sought from them?

A. Yes, sir; I never asked Mr. Whelen or Mr. McCandless a question that they did not tell me what I wanted to know.

Where all the parties to a contract expressly deny under oath any concealment or withholding of material facts, it requires something more than the unsupported allegations of strangers to the transaction to convict any of the parties of such concealment.

The gravamen of this charge rests in the fact that the appellants did not inform the committee that for the next few years there would be an increasingly easy money market, and that all municipal bonds would advance in value. How were

the appellants to know this? The future was concealed from their vision as well as from others. The opinion of many prominent men of Pittsburgh whose testimony is before us, shows that they entertained a different view of the situation. They thought that the revival of business would increase the demand for, and the rates of money, and that the time was favorable for providing for the large indebtedness of the city soon to mature, by securing a five per cent. loan at par. And the appellants may well have thought that by taking such a loan—thereby guaranteeing the credit of the city for several years—they were assuming a serious risk. There is much testimony which tends to prove that the very fact of this loan having been taken, at par, by capitalists admittedly able to carry out their contract, had a beneficial effect upon the credit of the city, and was an important element in the rise in value of its bonds.

The change in the contract by which the appellants, instead of being merely the agents of the city to place the loan, agreed to take all the bonds at a fixed price, was made at the request of the city authorities. This change may or may not have been wise. We express no opinion upon it. The effect of it was to relieve the city from the risks of the money market and to throw such risk upon the appellants. If the latter must take the venture of a possibly tight money market and a fall in the price of the bonds, it would be a harsh rule which would deny them the advantage of a rising market.

It was also urged as evidence of fraud that the contract was executed by the sub-committee on the last day of the life of the councils of which they were members; that the existence of the contract itself was concealed, and that the said contract was withheld from the newspapers for publication.

The fact appears to have been overlooked that the contract was but the close of a long negotiation, which had required much time, thought and labor on the part of the committee, and had the matter not been closed then, it might have been necessary to commence *de novo*. This would have involved further delay. And if the committee honestly believed, as it is manifest they did, that the contract was for the best interests of the city, no good reason appears why they should not have completed their work when they did. That their belief was shared by many of the best citizens of Pittsburgh is clear upon the evidence.

The alleged concealment of the contract was much magnified. There was no attempt to prove that either of the appellants participated in or approved of any concealment. The contract was reported by the sub-committee to the finance committee, and by the latter to city councils. This was done

in an orderly and regular manner. The contract was then handed to the City Controller for safe keeping. It was not the business of that officer to give such papers to the press for publication without authority. Subsequently, when the demand for its publication became general, a copy was furnished by authority and published in the newspapers. There was nothing in all this to show a fraudulent concealment of the contract.

Considerable stress was laid upon the fact that Mr. Whelen, one of the appellants, stated in his testimony that his firm did not purchase Pittsburgh five per cent. bonds at a premium prior to the final arrangement of May 14th, 1881, and that he did not consider it prudent to do so. Further, that he could have made the price either 95 or 105.

This was pressed as evidence of fraud.

If so, it must be from the fact that his firm was under a duty to buy Pittsburgh bonds, or (2) that they were in duty bound to put up the price.

The first proposition is not worth discussing. The second rests upon an entire misapprehension of Mr. Whelen's testimony. It is assumed that he could, by a nod of his head or wave of his hand, put up the price of the bonds. But the market for municipal bonds is not affected in that way. The way, and the only way by which such a result could have been accomplished, would have been to buy at a fixed price all the bonds that were offered on the market. This, in time, would give the bonds a fixed market value, when the purchaser could begin to sell and reimburse himself for his outlay. This course of dealing is known to every intelligent man at all conversant with the negotiation of municipal and other corporation bonds. It was the way Jay Cooke kept the Northern Pacific Railroad Bonds at par some years ago, when he was acting as the financial agent of the company, and it resulted in his financial bankruptcy. The load became too heavy to carry. To say that Mr. Whelen was in duty bound to employ his capital in this manner, and to assume the risk involved, and that his failure to do so is evidence of fraud, is too absurd a proposition to be seriously considered.

We find nothing in the evidence from which even a constructive fraud can be properly inferred.

The remaining question is one of power. Upon this point the report of the Master is entirely satisfactory, and we do not consider it necessary to discuss it at length.

The Act of 1879 expressly empowers the city councils to authorize by ordinance " the making, execution and negotiation of bonds," &c. It may fairly be inferred from this language that city councils were not expected to issue the bonds

themselves. Indeed, it was impracticable to do so. Corporations, whether private or municipal, act by agents. This is what councils did. They authorized the finance committee, or its sub-committee to make this loan. They authorized it to be made at six per cent. if they could do no better. They did better and procured it at five per cent. How then can it be said that the committee fixed the rate of interest without consulting councils. Where an agent is authorized to contract for six per cent. and contracts at seven, there is good reason why the consent of the principal shall be had before he can be bound. But where the agent contracts for five per cent. under an authority to give six, no reason is apparent why the principal may not be bound for the lesser sum.

But it was urged that there was an excess of power in this : that while the sub-committee were authorized to pay a commission of one per cent. upon a negotiation of the bonds by the agents of the city, yet when the syndicate became the purchasers of the bonds they ceased to be agents, and were not entitled to the commissions; hence, that in point of fact the allowance of one per cent. as commissions reduced the sale from a sale of bonds at par to a sale at 99 cents.

This is a very narrow point and does not call for an extended discussion. Giving it the widest scope claimed for it, we see nothing in it to justify a chancellor in striking down a partly executed contract, where the rights of other parties have grown up. But I am unable to see any force in the point. The contract was in terms a sale of the bonds at par and accrued interest. Was the agreement for a commission illegal? Councils had expressly authorized it in case the appellants negotiated the bonds. Does the form which the transaction finally assumed make any difference? We are considering this question in a court of equity; a court which disregards form and grasps the substance. The substance of this contract was that appellants should place these bonds at a fixed price, the appellants taking the risk of the market. No one supposed then, no one supposes now, that the appellants were taking these bonds upon their own account as a private investment. The bonds were placed at par and accrued interest, and the agreement to pay appellants a commission of one per cent. in no way affects their validity. It does not touch the question of power to issue the bonds. The question of the appellants' right to commissions cannot be decided in this proceeding. It is a matter between the appellants and the city, with which the appellees have no standing to interfere. The appellees cannot control the discretion of the city in a matter in which it has the power to act. A taxpayer as such can only come in and be heard,

where the city is proceeding in excess of power and in violation of law. This is the scope of Sharpless v. The City, 9 Harris 147, and the cases which have followed. It cannot be seriously contended that the city of Pittsburgh may not lawfully pay this commission.

The court below was of opinion that the contract permitted the syndicate to demand of the City Controller the full amount of the $6.000,000 of bonds even if that amount should not be required to redeem the Street Bonds, and attention was called to the fact that there was a considerable amount in the city treasury, the proceeds of the claims compromised under the Penn Avenue Act, and that more would be realized hereafter; that the proceeds from this source would altogether amount to $2,000,000, all of which would be applicable to the retirement of the Street Bonds. The evidence shows that the learned judge was probably over sanguine in his expectations upon this point. Be this as it may, I see nothing to interfere with the right of the city to apply this money when and as it is received, to the payment of Street Bonds. The contract means, taking it as a whole, that the appellants are to furnish so much money, and no more, as may be necessary to retire said bonds. That was the subject matter about which the parties had been negotiating, and which culminated in the contract of May 14th, 1881. The amount inserted in the contract, $6,000,000 was the sum supposed to be necessary; and taking the whole amount of Street Bonds with the interest, and the probable receipts from the compromise referred to, would appear not far from accurate. It would be a strained construction of the contract to hold that the appellants are entitled to $6,000,000 of bonds without reference to the amount required to retire the Street Bonds.

I have not overlooked the constitutional question involved, notwithstanding its extreme minuteness. Neither the Master nor the court below appear to have treated it with much favor. The sixth section of Article III. of the constitution provides that: "No law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only, but so much thereof as is revived, amended, extended or conferred shall be re-enacted and published at length." It was urged that the Act of 11th March, 1881, supplementary to the Act of May 9th, 1879, was in conflict with this constitutional provision for the reason that the second section of the Act of 1881 repeals the fifth section of the Act of 1879 without repeating the language of the repealed section.

. It is very plain that the evil which the constitution was intended to prevent was the revival of laws by their title merely, or the amending or extending the same in like man-

ner.· The learned Master has given a sample of this kind of legislation in an Act to be found at page 85 of the P. L. of 1872, which provides that "an Act entitled," &c., be further amended by striking out from the first section thereof the words following, viz: "Montgomery county," and the "village of Bustleton," and inserting in lieu of the words "Montgomery county" the word "Newtown," and in lieu of the words "village of Bustleton," "Newtown, Bucks county;" and by striking out from the third section of said Act the words "four" and "twenty-five," and inserting in lieu of the word "four" the word "thirty," and in lieu of the words "twenty-four" the word "fifty," &c., &c. There is abundance of this character of legislation running through the Pamphlet Laws for many years prior to 1874. There are two objections to it which no doubt influenced the constitutional convention; 1. Such an Act can only be nnderstood by reference to the Act which it was intended to amend, and 2. Such legislation furnishes great facilities for what are commonly known as "snakes," a homely but apt phrase to denote something of a vicious nature concealed in the body of the Act.

It would have been entirely competent for the constitution to have required that when an Act or a section of an Act was repealed, the Act or section so repealed should be recited at length in the repealing Act, but it has not done so. The section which supplies the one repealed is given and published at length. This is all the constitution requires. "So much thereof as is . . . . . amended . . . . . shall be re-enacted and published at length." If the whole amended law was intended to be republished at length, of what force are the words "so much thereof?"

We are of opinion that the Act of 1881 does not come within either the letter or the spirit of the constitutional prohibition.

It was further objected to these bonds that the provision contained therein by which the interest is made payable at the banking house of Henry Whelen & Co., in the city of Philadelphia was not authorized by the Act of 1879 or its supplements. Conceding this to be so it furnishes no reason why a chancellor should interfere with a partly executed contract. It was not a fraud upon or by the city and will involve the complainants, as tax-payers, in no loss. The change was doubtless made when it was found necessary to seek an eastern market for the bonds. If not absolutely essential, it was at least calculated to increase the facility for their negotiation, and in this sense may be said to be a positive benefit to the city. It is well known that to negotiate such bonds to advantage the interest must be made payable at the financial centre from which the money is expected to come.

[Appeal of Whelen.]

The foregoing was written shortly after the rising of the court at the last Term in the Western District, as embodying my individual view of the case. It is now filed as a dissenting opinion.

I regret that the majority of the court have not been enabled to reach the same result. I hope I may be mistaken, but I fear this decision will be a disaster to the city of Pittsburgh in the distrust which it may excite as to future issues of bonds under its corporate seal. It is true the act is not that of its corporate authorities, but it comes from her citizens and tax-payers, and if any one or more of them may thus trifle with her credit upon such grounds as have been developed in this case, her outlook for the future to my mind is not cheering.

The majority of the court have relieved the appellants of the charge of fraud. There is nothing to sustain it, and it should never have been made. The decision rests upon the single narrow point that the contract was in reality a sale of the bonds at 99. In terms it was a sale of the bonds at par, and in point of fact I believe not a bond has been sold for less. Whether the appellants, after having retired all the Street Bonds, would have been entitled to a commission of one per cent., is a question which in my judgment might well have been left until it arises. That is a question which could only be raised by the city. The complainants have no standing to raise it, as the city possesses the power to contract for and pay a commission. As before observed, it is only where the city is exceeding its power that a tax-payer can be heard.

The case was argued as though the city derived its sole authority from the Acts of Assembly cited. But it is settled law that a municipal corporation may issue bonds in payment of its debts, or to procure money to pay them, without authority from the legislature : See Com. ex rel. Bair & Shenk *v.* City of Williamsport, supra. This was all that the city of Pittsburgh was attempting to do in this case. It was doubtless thought the Acts of Assembly were necessary; the city possessed all the power needed outside of them.

I have no desire to criticise the views of the majority of my brethren, for whom I entertain profound respect. It is enough to say that the somewhat labored attempt to show that the bonds already issued are good because not issued in excess of power, while the issue of the remainder is enjoined because it would be in excess of power, sufficiently indicates the strain of the case. And since the question of fraud has been decided in favor of the appellants I am unable to see any foundation for the court to rest its decree upon.

My brothers GREEN and CLARK desire me to say that they concur in what I have said.

I would reverse the decree of the court below.

# CASES

### IN

# THE SUPREME COURT

### OF

# PENNSYLVANIA.

## EASTERN DISTRICT—PHILADELPHIA, 1885.